## ST. JOSEPH'S LIVING CENTER, INC. *v.*
## TOWN OF WINDHAM
## (SC 17916)

Norcott, Katz, Vertefeuille, Zarella and Schaller, Js.

Argued September 12, 2008—officially released March 24, 2009

*Aaron S. Bayer*, with whom were *Seth L. Huttner* and, on the brief, *Bennett J. Bernblum*, for the appellant (plaintiff).

*Thomas J. Londregan*, with whom was *Jeffrey T. Londregan*, for the appellee (defendant).

*Daniel J. Foster* filed a brief for the Connecticut Association of Not-for-Profit Providers for the Aging as amicus curiae.

ZARELLA, J. The primary issue raised in this appeal is whether the defendant, the town of Windham (town), properly denied the application of the plaintiff, St. Joseph's Living Center, Inc. (Center), a skilled nursing home facility, for a property tax exemption under General Statutes (Rev. to 2003) § 12-81 (7)[1] and General Statutes § 12-88.[2] On appeal, the Center claims that the trial court improperly concluded that its property was ineligible for tax-exempt status under § 12-81 (7).[3] The

[1] General Statutes (Rev. to 2003) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:
* * *
"(7) Property used for scientific, educational, literary, historical or charitable purposes. Exception. Subject to the provisions of sections 12-87 and 12-88, the real property of, or held in trust for, a corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes . . . provided (A) any officer, member or employee thereof does not receive or at any future time shall not receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes or as proper beneficiary of its strictly charitable purposes . . . ."
All references to § 12-81 throughout this opinion are to the revision of 2003 unless otherwise noted.

[2] General Statutes § 12-88 provides: "When property otherwise taxable may be completely or partially exempted. Real property belonging to, or held in trust for, any organization mentioned in subdivision (7), (10), (11), (13), (14), (15), (16) or (18) of section 12-81, which real property is so held for one or more of the purposes stated in the applicable subdivision, and from which real property no rents, profits or income are derived, shall be exempt from taxation though not in actual use therefor by reason of the absence of suitable buildings and improvements thereon, if the construction of such buildings or improvements is in progress. The real property belonging to, or held in trust for, any such organization, not used exclusively for carrying out one or more of such purposes but leased, rented or otherwise used for other purposes, shall not be exempt. If a portion only of any lot or building belonging to, or held in trust for, any such organization is used exclusively for carrying out one or more of such purposes, such lot or building shall be so exempt only to the extent of the portion so used and the remaining portion shall be subject to taxation."

[3] The Center actually makes three separate claims involving various factors that, according to the Center, relate to its eligibility for a tax exemption under § 12-81 (7). The claims that the Center briefed are: (1) the trial court failed to apply this court's current test for determining tax exemption eligibil-

Center also claims that the trial court improperly relied on irrelevant and clearly erroneous facts in denying its appeal.[4] Finally, the Center asserts that the trial court improperly concluded that the Center's chapel was not exempt from property tax pursuant to §§ 12-81 (13)[5] and 12-88. The town responds that the trial court correctly determined that the Center's property was not eligible for a tax exemption under § 12-81 (7) because the Center does not perform a charitable function and is not organized or operated exclusively for a charitable purpose. The town further contends that the trial court incorrectly determined that the Center is a § 501 (c) (3) corporation[6] under the Internal Revenue Code and

ity under § 12-81 (7); (2) the Center meets the test for exemption under § 12-81 (7) established in *Isaiah 61:1, Inc.* v. *Bridgeport*, 270 Conn. 69, 851 A.2d 277 (2004); and (3) the trial court improperly concluded that the Center's property is not tax-exempt because the Center accepts private paying patients and rehabilitative patients and because its revenue exceeds expenses.

[4] We do not address these claims individually but cover them fully in our discussion and application of the law with respect to the property tax exemption of charitable organizations under § 12-81 (7). We also will refer to the factual findings and conclusions of the trial court when appropriate and relevant, and discuss the propriety of those elements of the trial court's memorandum of decision when necessary.

[5] General Statutes (Rev. to 2003) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

\* \* \*

"(13) Houses of religious worship. Subject to the provisions of section 12-88, houses of religious worship, the land on which they stand, their pews, furniture and equipment owned by, or held in trust for the use of, any religious organization . . . ."

[6] Title 26 of the United States Code, § 501, provides in relevant part: "(a) Exemption from taxation

"An organization described in subsection (c) or (d) . . . shall be exempt from taxation under this subtitle . . . .

"(c) List of exempt organizations

"The following organizations are referred to in subsection (a):

\* \* \*

"(3) Corporations . . . organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . ." 26 U.S.C. § 501 (c) (3) (2006).

Section 501 (c) (3) of the Internal Revenue Code sets forth guidelines for determining whether an organization is qualified for a federal income tax exemption under 26 U.S.C. § 501 (c) (3). It provides in relevant part: "In

that this fact is relevant because it precludes the Center from satisfying the requirements of General Statutes § 12-89a. We agree with the Center that many of the trial court's factual findings are clearly erroneous. We also conclude that the trial court's statement of the law is incomplete, and, as a result, its application of the law to the facts is flawed. Consequently, we reverse in part the judgment of the trial court.

The record reveals the following relevant facts and procedural history.[7] The Center's nursing home facility was constructed in 1987 on approximately ten acres of cemetery land owned by the Roman Catholic Diocese of Norwich (diocese), which eventually was transferred to the Center via a quitclaim deed. The facility was built with the financial assistance of a for-profit partner pursuant to an agreement granting the Center an option to buy out the partner after five years. Despite the financial partnership, the diocese and the Center maintained complete operational control over the facility. In 1994, the Center exercised its option and bought out the partner by obtaining a $13,385,000 loan financed through the Connecticut Health and Educational Facilities Authority (CHEFA), which raised the funds through a tax-exempt bond issuance. Upon assuming sole ownership of the facility, the Center applied to the town for a property tax exemption. The town tax assessor (assessor) denied the application on the ground that the facility did not provide free care to any of its patients and thus was not used exclusively for a charitable purpose. The assessor also determined that the Center's

order to be exempt as an organization described in section 501 (c) (3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section. . . ." 26 C.F.R. § 1.501 (c) (3)-1 (a) (2008).

[7] To the extent possible, we rely on the trial court's memorandum of decision for our recitation of the facts. When necessary, we supplement the court's findings with facts culled from either undisputed testimony or stipulated exhibits.

facility was ineligible under § 12-81 (7) because it constituted "long term and permanent housing," which specifically is denied exemption under the statute.[8]

Subsequently, in 2003, the Center reapplied for a property tax exemption for the 2003, 2004 and 2005 tax years, claiming an exemption under § 12-81 (7) and (75).[9] This application again was denied by the assessor, who considered the use of the property not to be entirely charitable.[10] The town's board of assessment appeals denied the Center's appeal from the assessor's decision, and the Center appealed to the Superior Court.

At trial, the Center claimed that its property was exempt from property tax under § 12-81 (7), (12)[11] and (13). The trial court disagreed, concluding that it was not exempt from property tax because, "although [the Center is] operated efficiently and with the best of intentions, [it] is simply not a charity nor are its uses charita-

---

[8] The Center did not appeal from this denial.

[9] On appeal, the Center does not pursue its claim under § 12-81 (75).

[10] The assessor also stated that "[§] 12-81 (75) excludes the possibility of exempt status, since this property was taxable on the October 1, 2000 [g]rand [l]ist and there is no 'time-limited agreement' with the [t]own . . . ." Neither the trial court nor the Center's appellate brief relies on § 12-81 (75). Thus, we need not discuss this subdivision of the statute in any detail. We note, however, that § 12-81 (75) does not operate to *exclude* any properties from tax exemption under other subdivisions of § 12-81 but merely provides in relevant part that it "shall not affect (1) the taxability in assessment years commencing on or after October 1, 2000, of any such property that was taxable on the net grand list . . . next preceding June 1, 2000 . . . ." General Statutes (Rev. to 2003) § 12-81 (75). The assessor was mistaken in her interpretation of § 12-81 (75), which, by its terms, is inapplicable to the Center's application under § 12-81 (7) and (13).

[11] General Statutes (Rev. to 2003) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

\* \* \*

"(12) Personal property of religious organizations devoted to religious or charitable use. Personal property within the state owned by, or held in trust for, a Connecticut religious organization, whether or not incorporated, if the principal or income is used or appropriated for religious or charitable purposes or both . . . ."

ble." After setting out what it deemed to be the applicable legal framework, the trial court found eleven characteristics that distinguished the Center from the organizations that we found to be tax-exempt under § 12-81 (7) in *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* 147 Conn. 510, 162 A.2d 700 (1960), and *Isaiah 61:1, Inc.* v. *Bridgeport,* 270 Conn. 69, 851 A.2d 277 (2004).[12] The Center appealed to the Appellate Court from the trial court's judgment denying the Center's appeal, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

We begin our analysis with a brief review of the following additional undisputed facts regarding the

---

[12] The eleven distinguishing "characteristics," many of which the Center attacks as irrelevant or erroneous, and which we will discuss as necessary in the analysis that follows, are: (1) "[t]he [Center] is a 120 bed skilled nursing home facility licensed as such by the state"; (2) "[t]he [Center] has three types of patients [namely] Medicare patients . . . Medicaid patients and private pay patients . . . [and] [t]here are no income or wealth restrictions on admission to the [Center's facility]"; (3) "[t]here was no financial burden from the operation of the [Center's] facility, either on the [Center] or on the diocese"; (4) "[t]he [Center] generates an excess of operating income over operating expenses and, for several years, made payments to the diocese that are related to lease payments, although the Center is in possession of the subject property by virtue of a quitclaim deed, not a lease"; (5) "[t]he [Center] provides skilled nursing care to all of its patients in the same manner as any other skilled nursing home, whether operated for profit or nonprofit motives"; (6) "[i]f the [Center] did not provide the skilled nursing services that it does, the alternative is not for the government to take over this obligation but, rather, other, similar facilities"; (7) "[s]ome of the services provided by the [Center] as a skilled nursing home facility are rehabilitative in nature and, therefore, not used exclusively for the elderly or for long-term care"; (8) "[t]he [Center] does not receive, [and] is [not] in need of, outside financial support in the operation of the skilled nursing home facility"; (9) "[t]he [Center] does not admit indigent patients at [its] expense . . . since all patients at the Center are either supported by Medicare, Medicaid or self-supporting"; (10) "[t]he operation of the [Center] does not lessen the burden on society or taxpayers since it receives compensation for services rendered"; and (11) "[i]f the property tax exemption being sought by the [Center] were granted, not only would the town lose the benefit of the tax, but also the [Center] would not be entitled to claim the payment of the tax as part of its reimbursable costs under Medicaid."

organization and operation of the Center. St. Joseph's Living Center, Inc., was organized in 1987 as a nonstock, nonprofit Connecticut corporation exempt from federal income taxes under § 501 (c) (3) of the Internal Revenue Code. See footnote 6 of this opinion. The Center operates a 120 bed skilled nursing facility licensed by the state for both long-term chronic care and short-term rehabilitative services. The facility also houses a large chapel that holds a daily mass and is the nucleus of spiritual life at the Center. The Center is affiliated with the diocese and the St. Joseph's Roman Catholic Parish of Willimantic (St. Joseph's Parish). The Bishop of Norwich (bishop) is the Center's chairman and appoints the other three members of the Center's board of directors.

The Center employs approximately 200 individuals in operating the nursing home facility, including an administrator, medical and nursing directors, registered and licensed practical nurses, certified nursing assistants, social workers, physical, speech and occupational therapists, a chaplain, dietary staff, and maintenance and housekeeping personnel. All staff salaries are slightly below market rates. In addition to this paid staff, the Center also maintains an active list of seventy to ninety volunteers who perform various functions including taking the residents to daily mass, running the gift shop, helping with the chapel, accompanying residents on day trips and participating in "vigil teams."[13] More volunteer services are provided by priests from St. Joseph's Church, who visit the Center regularly to support the spiritual life at the facility.

The Center derives most of its revenue from the health care services that it provides from Medicaid and Medicare reimbursement and payments from private

[13] Vigil teams carry out an end of life program at the Center, providing comfort to those residents, especially those without family, who are near death.

paying patients. Between 2000 and 2005, the Center's census went from 50 percent Medicaid patients, 17 percent Medicare patients and 33 percent private paying patients, to 64 percent Medicaid patients, 17 percent Medicare patients, and 19 percent private paying patients. The substantial and steady increase in the number of Medicaid patients during this period is financially significant, as Medicaid does not fully reimburse the Center for actual patient costs.[14] The Center generally does not provide free care, although there are circumstances in which patients do not pay or there is a period of time during which there is no payment from any source.

The record indicates that the Center received charitable contributions during the period of 2000 to 2005 in the amounts of $41,136, $18,584, $56,563, $33,706, $30,668 and $51,755, respectively. In addition, the Center reported making contributions out of its excess revenue to the diocese and St. Joseph's Church during the period of 2001 to 2005 in the amounts of $42,000, $72,000, $84,000, $84,000 and $63,000, respectively.[15] In addition to the charitable contributions flowing to the

[14] The Center's Medicaid reimbursement rate fell approximately 20 percent below the actual expenses incurred by the Center in treating Medicaid patients for the period of 2003 through 2005. The trial court recognized this Medicaid gap in its memorandum of decision, indicating that it credited the testimony and exhibits proffered by the Center in this regard.

[15] In 2001 and 2002, these contributions to the diocese were described as "[payments] in connection with the lease of certain property." Thereafter, in 2003 through 2005, the contributions were denoted "voluntary, nonreciprocal transfer[s] to St. Joseph's Church, an affiliated organization also sponsored by the [d]iocese" and were charged to operations as a contribution expense. There is no evidence of the existence of any lease between the diocese and the Center, and, in fact, the record reveals that the Center owns the land on which the facility sits by virtue of the quitclaim deed from the diocese, and owns the structures located on that property by virtue of the February 1, 1994 mortgage agreement between the Center and CHEFA. Therefore, the description of these transfers between the Center and the diocese and St. Joseph's Church as being "in connection with" a lease apparently was an error that subsequently was corrected.

Center through annual fundraisers and occasional testamentary gifts, the Center receives material and financial support from the diocese and St. Joseph's Church. The diocese donated the land for the Center's facility, valued at $1.22 million in 1994, in addition to outfitting the chapel and furnishing all of the religious objects adorning the facility.[16] Moreover, the diocese supports the Center financially by reducing its costs for employee health insurance by $120,000 per year.[17] The diocese also provides a rebate to the Center staff for health insurance copayments in the amount of $250 per person, as they are incurred.[18]

In accordance with state law, the Center's admission policy does not discriminate between potential patients on the basis of their ability to pay.[19] The record also indicates that the Center has never forced a patient to leave the facility for a failure or inability to pay. Furthermore, the Center does not give any admissions preference to those individuals who are covered by

[16] The CHEFA bond prospectus valued the land at $1.22 million in 1994. We note that there is no indication in the record that a formal appraisal of the property has been conducted, and we use the $1.22 million figure merely as a useful estimate. The precise value of the property is not relevant to our analysis in this case.

[17] The facility administrator testified that the employee health insurance deduction paid for by the diocese saved the Center $60,000 in 2005 and $120,000 in 2006.

[18] This program was initiated in response to an increase in deductibles under the employees' health plan for outpatient surgeries to $500. The total amount that the diocese paid to Center personnel under this program from September, 2005, to May, 2006, was $2750.

[19] The facility administrator testified that the facility has a nondiscriminatory admissions policy, and mentioned a state "waiting list law . . . ." The law to which she presumably was referring is General Statutes § 19a-533, which provides in relevant part: "(b) A nursing home which receives payment from the state for rendering care to indigent persons [those eligible for Medicaid assistance] shall:

"(1) Be prohibited from discriminating against indigent persons who apply for admission to such facility on the basis of source of payment. Except as otherwise provided by law, all applicants for admission to such facility shall be admitted in the order in which the applicants apply for admission. . . ."

private health insurance or who otherwise are able to pay from private sources. Because there is no way for the Center to control how many Medicaid patients are admitted, it is impossible for it to know with certainty what the Medicaid funding gap will be in any given year. In developing a budget, the facility administrator, therefore, must rely on an estimated patient census based on previous years in order to forecast what revenue might be available for expenses.

The Center pays approximately $950,000 to $1 million annually to service the principal and interest of its mortgage. In addition, the terms of its agreement with CHEFA require the Center to maintain a surplus of revenue over its total expenses that is 25 percent greater than its required mortgage payment (debt service coverage ratio). Pursuant to the CHEFA financing arrangement, this money must be set aside in various trust accounts and cannot be used for operational expenses, except that certain of the funds, such as the working capital fund and the reserve and replacement fund, may be accessed under extraordinary circumstances or for specific expenditures. The record includes the Center's audited financial statements for the years 2000 through 2005. During each of those years, the Center reported an excess of revenue and support over expenses, and complied with CHEFA's required debt service coverage ratio of at least 1.25:1.[20] A failure to meet the debt service

[20] In 2000, net revenue available for debt service totaled $1,693,959, principal and interest on the mortgage totaled $1,017,663 and the debt service coverage ratio was 1.66:1. In 2001, net revenue available for debt service totaled $1,610,680, principal and interest totaled $998,478, and the debt service coverage ratio was 1.61:1. In 2002, net revenue available for debt service totaled $1,332,376, principal and interest totaled $966,779, and the debt service coverage ratio was 1.38:1. In 2003, net revenue available for debt service totaled $1,227,413, principal and interest totaled $965,651 and the debt service coverage ratio was 1.27:1. In 2004, net revenue available for debt service totaled $1,289,271, principal and interest totaled $972,329, and the debt service coverage ratio was 1.33:1. Finally, in 2005, net revenue available for debt service totaled $1,219,040, principal and interest totaled $969,706, and the debt service coverage ratio was 1.26:1.

coverage ratio is considered a default on the CHEFA bonds and could result in the state's placement of the facility in receivership or the institution of bankruptcy proceedings against the Center.

In an effort to gain more fiscal security and control, and to ensure that it was meeting its debt service coverage ratio obligation, the Center attempted to expand its patient base. In addition to increasing its principal, long-term chronic care services, the Center sought to increase its population of short-term rehabilitative care patients in hopes of eventually utilizing twenty-five to forty beds for these services, or up to one third of its capacity. Although the record is somewhat unclear, it appears that the Center may reserve a bed for a rehabilitation patient if it knows that such an individual will be coming from a hospital for postsurgical rehabilitation, but admissions otherwise are on a first-come, first-served basis without regard to whether an individual requires short-term or long-term care.[21] The record indicates that short-term rehabilitative care is generally more cost effective for the facility because it is covered under Medicare or by private health insurance and therefore is fully reimbursed.

Before turning to the substantive aspects of the case, we address the appropriate standard of review. "It is well settled that [w]e review the trial court's conclusion in a tax appeal pursuant to the well established clearly erroneous standard of review. Under this deferential standard, [w]e do not examine the record to determine

---

[21] The facility administrator testified in relevant part:

"Q. . . . Would [the Center] have any policy with regard to whether or not a bed would be available for [a] particular patient or perhaps someone coming from rehabilitation?

"A. We really take first come first serve[d]. But usually, there's the twenty-five beds we try to reserve for short term if we know someone is in the hospital . . . . [S]o we kind of reserve the bed for them knowing that they're coming. But if we don't have anyone coming . . . we don't discriminate . . . ."

whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* 262 Conn. 213, 219–20, 811 A.2d 1277 (2002). A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *United Technologies Corp.* v. *East Windsor,* 262 Conn. 11, 23, 807 A.2d 955 (2002)." (Internal quotation marks omitted.) *Isaiah 61:1, Inc.* v. *Bridgeport,* supra, 270 Conn. 73.

Our analysis also is informed by our settled approach to the construction of tax exemption statutes. "It is . . . well established that in taxation cases . . . provisions granting a tax exemption are to be construed strictly against the party claiming the exemption, who bears the burden of proving entitlement to it. . . . *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* supra, 262 Conn. 220. Exemptions, no matter how meritorious, are of grace . . . . [Therefore] [t]hey embrace only what is strictly within their terms. . . . We strictly construe such statutory exemptions because [e]xemption from taxation is the equivalent of an appropriation of public funds, because the burden of the tax is lifted from the back of the potential taxpayer who is exempted and shifted to the backs of others. . . . Id. [I]t is also true, however, that such strict construction neither requires nor permits the contravention of the true intent and purpose of the statute as expressed in the language used. . . . *Hartford Hospital* v. *Hartford,* 160 Conn. 370, 375, 279 A.2d 561 (1971)." (Internal quotation marks

omitted.) *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 73–74.[22]

Because the Center's claim for exemption is based primarily on § 12-81 (7), we begin our discussion with the text of that subdivision of the statute. In order to qualify for a property tax exemption under the relevant portions of § 12-81 (7), the property must be owned by, or held in trust for, "a corporation organized exclusively for scientific, educational, literary, historical or charitable purposes or for two or more such purposes and used exclusively for carrying out one or more of such purposes," and no "officer, member or employee" may "receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes . . . ." General Statutes (Rev. to 2003) § 12-81 (7). In *Isaiah 61:1, Inc.*

---

[22] We note that this rule regarding the strict construction of tax exemption statutes, specifically, the statute at issue in the present case and its predecessors, has not always been applied in cases involving educational, scientific or charitable organizations. In fact, the property of such organizations was treated rather uniformly as being subject to "a rule of nontaxability." *Arnold College for Hygiene & Physical Education* v. *Milford*, 144 Conn. 206, 210, 128 A.2d 537 (1957). Indeed, contrary to our modern approach, we once held the view that such exemptions were "not merely an act of grace on the part of the [s]tate . . . [but stood] squarely on [s]tate interest. To subject all such property to taxation would tend rather to diminish than increase the amount of taxable property. Other conditions being equal, the happiness, prosperity and wealth of a community may well be measured by the amount of property wisely devoted to the common good . . . ." *Yale University* v. *New Haven*, 71 Conn. 316, 332, 42 A. 87 (1899). Our approach to such statutes reflected this understanding: "Consequently, [General Statutes (1949 Rev.) § 1761 (7), a functionally identical predecessor of § 12-81 (7)] does not come within the rule that tax exemption statutes must be construed strictly against the taxpayer." *Arnold College for Hygiene & Physical Education* v. *Milford*, supra, 210; see also *Loomis Institute* v. *Windsor*, 234 Conn. 169, 176, 661 A.2d 1001 (1995) (articulating and following more liberal rule of construction applied to educational institutions). We cannot discern precisely why this approach has seemingly become extinct, nor is it particularly clear whether it is applicable beyond the educational context. We need not solve this mystery in the present case, however, as our resolution of the issues presented by this appeal would be the same under either approach.

v. *Bridgeport,* supra, 270 Conn. 69, this court's most recent detailed treatment of the statute, we held that, "in order for real property used for charitable purposes to qualify for tax exemption under §§ 12-81 (7) and 12-88, the property must: (1) belong to or be held in trust for a corporation organized exclusively for charitable purposes; (2) be used exclusively for carrying out such charitable purposes; (3) not be leased, rented or otherwise used for a purpose other than the furtherance of its charitable purposes; (4) not be housing subsidized by the government; and (5) not constitute low or moderate income housing." Id., 76–77. We will proceed to examine each of these requirements in turn.

At the outset, we note that the fourth and fifth prongs of the *Isaiah 61:1* test are clearly inapplicable in this case. There has been no claim that the Center's facility is "housing," as that term is ordinarily understood, nor does the record support such a characterization. In addition, the third prong is applicable only when the taxpayer is allowing another entity to use its property and is claiming that such a use is in furtherance of its own charitable purpose.[23] See id., 85. Because that prong is not applicable in the present case, our analysis of the Center's claims under § 12-81 (7) is confined to the first two prongs of the *Isaiah 61:1* test, which precisely track the statutory language.

Before proceeding further, we also take this opportunity to address the town's claim that the trial court incorrectly determined that the Center is a § 501 (c) (3) corporation. See 26 U.S.C. § 501 (c) (3) (2006). The town asserts that, if we find that the Center is not a § 501 (c) (3) corporation, then it fails to meet certain statutory requirements relevant to its tax status. Specifi-

___

[23] Although the language of this prong closely tracks the language set forth in § 12-88, such resemblance is mere happenstance, and any claim under § 12-88 must be analyzed separately.

cally, the town argues that the Center does not operate as a nonprofit corporation with respect to its sources of revenue and would be unable to satisfy the reporting requirements of General Statutes § 12-89a. We will address each of these arguments in turn.

The trial court expressly found that the Center was "organized in 1987 as a nonstock, nonprofit corporation exempt from federal income tax under . . . § 501 (c) (3) [of the Internal Revenue Code] . . . ." This finding is supported by a letter from the Internal Revenue Service to the United States Conference of Catholic Bishops, dated June 10, 2003,[24] which provides that "the agencies and instrumentalities and educational, charitable, and religious institutions operated, supervised, or controlled by or in connection with the Roman Catholic Church in the United States . . . appearing in *The Official Catholic Directory* for 2003 are exempt from federal income tax under [§] 501 (c) (3) of the [Internal Revenue] Code." (Emphasis in original.) The Center is listed on page 884 of the 2003 Official Catholic Directory. The town has not challenged the authenticity or accuracy of these documents, which the trial court apparently credited in arriving at its conclusion that the Center is a § 501 (c) (3) corporation. General Statutes § 12-89a provides in relevant part that "[a]ny organization claiming exemption from property tax . . . under the provisions of . . . [§ 12-81 (7)] may be required upon request, at any time, by the assessor or board of assessors in such municipality to submit evidence of certification from the Internal Revenue Service . . . that such organization has been approved for exemption from federal income tax as an exempt organization under Section 501 (c) or 501 (d) of the Internal

[24] This is one of a series of documents referred to throughout the record as a "[g]roup [r]uling," pursuant to which all eligible organizations listed in the Official Catholic Directory are afforded a group exemption from federal income taxes under the auspices of the Roman Catholic Church of the United States.

Revenue Code." On the basis of the trial court's finding and our review of the record, we conclude that, even if it is assumed that § 12-89a is relevant to this case, the Center complies with its requirements.

We also note that the Center satisfies that part of § 12-81 (7) providing that no "officer, member or employee thereof [shall] . . . receive . . . any pecuniary profit from the operations thereof, except reasonable compensation for services [provided] . . . ." General Statutes (Rev. to 2003) § 12-81 (7). The trial court characterized the Center as a "nonstock, nonprofit" corporation and noted in its memorandum of decision that the Center's certificate of incorporation provides that the Center "shall not carry on any activity not permitted to be carried on by a corporation exempt from federal income tax under [§] 501 (c) (3) of the [Internal Revenue] Code. No part of the income or net earnings of the [Center] is distributable to, or shall inure to the benefit of, any members, director or officer of the [Center], or any private individual or organization organized for profit (except that reasonable compensation may be paid for services rendered to or for the [Center]), and no member, director, officer of the [Center], or any private individual or organization organized for profit, shall be entitled to share in the distribution of any of the corporate assets upon dissolution." The testimony of Monsignor Willis West, the pastor of St. Joseph's Parish, which the town did not contest, supports the trial court's implicit finding that the Center indeed operates according to its charter as a nonprofit corporation.[25] We conclude, therefore, that this particular

[25] Monsignor West testified as follows: "Q. Let me ask you some questions about the organization of [the Center]. Is [the Center] set up as a non-profit corporation?

"A. Oh, yes. Just like all of our other institutions.

"Q. Are there any shareholders?

"A. No, no. And nobody gets any money, none of the board members. They get a lot of grief, but they don't get any money. No, we serve voluntarily, all of us."

clause of § 12-81 (7) is satisfied and proceed to discuss the remainder of the relevant statutory provisions in light of the *Isaiah 61:1* factors and the interpretive gloss that our prior cases have added to these provisions.

We note that this area of law is particularly complicated, and, therefore, in the interest of clarity, we divide the following analysis into three parts. The first two parts of our analysis will discuss the first two statutory requirements set forth in *Isaiah 61:1, Inc.* In each part, we will set out the legal framework for each factor and then proceed to apply that law to the facts of this case, addressing the parties' related arguments as well as the applicable trial court findings. Finally, in the third part, we will address the Center's claim for a tax exemption with respect to its chapel.

I

## CHARITABLE PURPOSE[26]

The first statutory requirement in *Isaiah 61:1, Inc.*, for tax-exempt status under §§ 12-81 (7) and 12-88 is

[26] In his concurrence and dissent, Justice Schaller declares that he finds it "unnecessary to reach the question of whether the Center has been organized exclusively for a charitable purpose" because we generally agree with the trial court that the Center's property is not "used exclusively for charitable purposes . . . ." We believe it is necessary to reach this question for several reasons. The first reason is the policy of judicial economy. Unlike in the "normal" case, the Center can renew its request for a tax exemption in subsequent applications, thereby raising the issue of whether it is "organized exclusively" for a charitable purpose in future appeals. Second, this case provides an important opportunity for this court to afford guidance to courts, taxing authorities and taxpayers alike in the context of a squarely raised and fully briefed issue that is likely to recur with some regularity. Third, and relatedly, this case provides an ideal occasion to clarify the confusion of our past cases on this topic. Finally, and perhaps most importantly, we fail to see how we can properly analyze the trial court's findings as they relate to the "exclusive use" prong of § 12-81 (7) without first determining whether the Center is, in fact, organized for a charitable purpose, and, if so, what that purpose is. Only by making this threshold determination can we proceed to consider whether the Center's use of its property is exclusively in furtherance of that purpose.

that the property must "belong to or be held in trust for a corporation organized exclusively for charitable purposes . . . ." *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 77. We consider three factors in making this determination. The first, and most important, factor requires an examination of the corporate entity itself to determine if it is organized to carry out an exclusively charitable purpose. The second factor that we previously have considered, to a lesser extent, is whether an entity claiming charitable status for tax exemption purposes is self-supporting. The third factor asks whether an organization's activities serve to relieve a burden on the state.[27] Finally, we address several findings of the trial court with reference to the Center's provision of care to patients who compensate the facility through private health insurance or their own personal assets.

## A

### Organized Exclusively for Charitable Purposes

The first element—whether a corporation is organized exclusively for charitable purposes—can be broken into two parts. First, we must determine for what purposes a particular corporation has been "organized." We then must decide whether that purpose is, in fact, "charitable." The trial court found that, "[a]lthough the [Center] is organized and operated as a nonprofit corpo-

---

[27] Because these factors never have been synthesized and explained in a comprehensive fashion, it is unclear whether a failure to establish any one of them is fatal to a claim under the exclusively charitable purpose prong. We therefore clarify that only the first factor, i.e., whether the purpose expressed in the organization's fundamental documents, is the sine qua non of a charitable organization. Once a court determines that an organization has an exclusively charitable purpose, the other factors should be considered under the totality of the circumstances to determine whether the organization is, in fact, fulfilling its charitable purpose. This analysis should not be confused, however, with the question of whether the property in question is being used by the taxpayer exclusively in furtherance of that charitable purpose.

ration, its original purpose was not charitable." We understand this to mean that the purpose for which the Center is organized is not charitable. The town, in its brief, voices a similar understanding of the trial court's memorandum of decision: "The trial court in the [present] case found that . . . the delivery of health care to the elderly is not a charitable purpose." We thus examine the relevant law in light of this finding.[28]

In determining the purposes for which a corporation has been formed, we begin by examining the entity's foundational documents. "The purposes for which a corporation is organized are to be found in its charter . . . ." *Waterbury First Church Housing, Inc.* v. *Brown*, 170 Conn. 556, 561, 367 A.2d 1386 (1976); accord *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan*, supra, 147 Conn. 514; see also *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 86 ("a corporation's charter reveals its purpose"); *H-C Health Services, Inc.* v. *Board of Assessors*, 42 Mass. App. 596, 599, 678 N.E.2d 1339 ("whether a taxpayer is a charitable organization . . . depends upon the language of its charter or articles of association, constitution and by-laws, and upon the objects which it serves and the method of its admin-

---

[28] Justice Schaller criticizes our "analysis of whether the Center has been organized exclusively for charitable purposes . . . ." He accuses the majority of "disregard[ing] the findings of the trial court and . . . assum[ing] the function of the finder of fact" throughout our discussion of whether the Center is organized exclusively for a charitable purpose. Justice Schaller's criticism in this regard focuses on part I B of this opinion, and he provides no specific instances of this alleged improper fact-finding in part I A of this opinion. We note that, in this part of our opinion, which includes the critical inquiry regarding the purpose expressed in the Center's fundamental corporate documents, we refer to several pieces of evidence, namely, the Center's certificate of incorporation, which is a formal legal document filed with the secretary of the state and a matter of public record, and a portion of the Center's bylaws and mission statement, documents evincing similar indicia of accuracy and reliability. Furthermore, the trial court explicitly referred to each of these documents in its memorandum of decision. The validity of each of these documents remains unquestioned, and from their contents we glean the Center's corporate purpose.

istration . . . or, as otherwise expressed, upon the declared purposes and the actual work performed" [internal quotation marks omitted]), review denied, 425 Mass. 1104, 682 N.E.2d 1361 (1997).

The Center's purpose, as stated in its certificate of incorporation, is: "a) To operate exclusively for charitable, educational and scientific purposes, all for the public welfare consistent with activities permitted to be performed by a corporation classified under [§] 501 (c) (3) of the Internal Revenue Code of 1986 . . . .

"b) To develop, operate and maintain a chronic and convalescent care nursing home (i.e., skilled nursing facility) . . . in accordance with applicable state and federal regulations . . . and operate adult day care and other related programs . . . ."

Article I, § 4, of the Center's bylaws provides, as one of its stated purposes, "[p]rimarily to fulfill the goals and aspirations of the Roman Catholic Church in its ministry and service to the elderly and to those who are ill located in the [d]iocese . . . regardless of their race, color, creed or religion." The Center's mission statement "is to provide quality health care to [its] residents in a spirit of compassion, love and service, consistent with the Gospel of Jesus Christ."

Having gleaned the Center's corporate purpose from its charter and related documents, we next must determine whether that purpose is charitable. The modern approach to defining a charitable use or purpose is rather broad and liberal. Almost fifty years ago, this court explained that "[t]he definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. *Mitchell* v. *Reeves*, 123 Conn. 549, 554, 196 A. 785 [1938]. It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to

improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. *Bader Realty & Investment Co.* v. *St. Louis Housing Authority*, 358 Mo. 747, 752, 217 S.W.2d 489 [1949]. Charity embraces anything that tends to promote the well-doing and the well-being of social man. [Id.] An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust."[29] *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan*, supra, 147 Conn. 514–15; see also *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 76 ("[i]n construing [§ 12-81 (7)], we have embraced a broad definition of the term 'charitable purpose' "); cf. *Knox County Property Tax Assessment Board of Appeals* v. *Grandview Care, Inc.*, 826 N.E.2d 177, 182 (Ind. Tax 2005) ("a charitable purpose will generally be found to exist if: 1) there is evidence of relief of human want . . . manifested by obviously charitable acts different from the everyday purposes and activities of man in general; and 2) there is an expectation of a benefit that will inure to the public by the accomplishment of such acts" [internal quotation marks omitted]).

We had occasion to comment on the charitable nature of caring for the elderly in *Waterbury First Church Housing, Inc.* v. *Brown*, supra, 170 Conn. 556. Although that case did not deal directly with the provision of long-term health care for the elderly, our analysis of

---

[29] The Restatement (Second) of Trusts, § 368, which describes valid purposes for which a charitable trust can be created, includes "the advancement of religion," "the promotion of health" and "other purposes the accomplishment of which is beneficial to the community." 2 Restatement (Second), Trusts § 368 (c), (d) and (f) (1959). The comments to § 368 continue this liberal theme: "Other purposes of the same general character are likewise charitable. The common element of all charitable purposes is that they are designed to accomplish objects which are beneficial to the community." Id., comment (a).

the corporate purpose of the plaintiff in that case is instructive. In *Waterbury First Church Housing, Inc.*, the nonprofit plaintiff corporation's purpose was "to provide rental housing and related facilities and services specially designed to meet the physical, social, and psychological needs of the aged, and contribute to their health, security, happiness and usefulness." (Internal quotation marks omitted.) Id., 561. We held this purpose to be charitable in light of "the fact that in recent years large sums of public funds ha[d] been expended to provide low-income housing, and the [plaintiff corporation's] dedication to making private low-rental housing for elderly persons on fixed incomes a reality clearly [was] an effort to make it less likely that they [would] become burdens on society . . . ." (Internal quotation marks omitted.) Id.

Other jurisdictions that have addressed more directly the charitable nature of providing long-term health care for the elderly have found such a purpose to be charitable. See, e.g., *Knox County Property Tax Assessment Board of Appeals* v. *Grandview Care, Inc.*, supra, 826 N.E.2d 182 ("Indiana courts have long recognized that providing care and comfort to the aged constitutes a charitable purpose"); *H-C Health Services, Inc.* v. *Board of Assessors*, supra, 42 Mass. App. 599 ("[t]he language of the charter of the appellees—dedication to the care of the elderly and the infirm, with no financial benefit permissibly flowing to private investors—is the language of a charitable organization, and the operation of a nursing home for the elderly and the infirm is the work of a charitable corporation"); *Wexford Medical Group* v. *Cadillac*, 474 Mich. 192, 215–19, 713 N.W.2d 734 (2006) (nonprofit organization providing, inter alia, health care services to elderly constituted charitable organization); see also *Evangelical Lutheran Good Samaritan Society* v. *Gage*, 181 Neb. 831, 836, 151 N.W.2d 446 (1967) (nursing homes not operated for

private gain recognized as charitable institutions); *Catholic Charities of the Diocese* v. *Pleasantville,* 109 N.J. Super. 475, 480–81, 263 A.2d 803 (App. Div.) (nonprofit nursing home deemed to be charitable institution), cert. denied, 56 N.J. 474, 267 A.2d 56 (1970); *Hilltop Village, Inc.* v. *Kerrville Independent School District,* 426 S.W.2d 943, 947 (Tex. 1968) ("[t]he decisions recognizing tax exemption are rested principally upon the conclusion that people in later years have special care and residential requirements, the alleviation of which is of social value; and that exemption should be allowed [when] such needs are being met by institutions not organized or operated for private profit").

The trial court determined that the Center's "original purpose was not charitable." We do not agree. Although the Center initially was operated in partnership with a for-profit entity, it is unclear whether its *original purpose* was noncharitable. The Center's original certificate of incorporation is not a part of the record, nor was any testimony elicited regarding whether the stated purpose of the organization was changed in the amendments to the certificate that were filed following the buy out of the for-profit partner. Therefore, to the extent that it is relevant, there is no evidence as to what the Center's "original purpose" was. What is certainly relevant is the Center's purpose during the tax years for which an exemption was claimed, and that purpose and mission, as stated in the corporate documents to which we previously referred, are most certainly charitable. The provision of long-term health care and spiritual support to the elderly in a nonprofit, nondiscriminatory manner and without regard to individual financial circumstances is a charitable purpose.[30]

---

[30] There is little doubt that such a purpose would support the creation of a valid charitable trust. See *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 147 Conn. 515 ("[a]n institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust"). The Restatement (Second) of Trusts,

The trial court's conclusion that the Center's purpose is not charitable is incorrect as a matter of law and is based on a misinterpretation of our prior cases. Relying on, inter alia, *United Church of Christ* v. *West Hartford*, 206 Conn. 711, 539 A.2d 573 (1988), the court concluded that our cases do not support the Center's contention that "[t]he delivery of health care to the elderly is a charitable purpose." (Internal quotation marks omitted.) In our view, *United Church of Christ* does not support such a narrow conception of what constitutes a charitable purpose.

In *United Church of Christ*, we concluded that the plaintiff corporation's property, which was being utilized as an elderly housing complex; id., 714; was not

§ 368, includes in its list of charitable purposes, inter alia, the advancement of religion, the promotion of health and other purposes, the accomplishment of which is beneficial to the community. 2 Restatement (Second), Trusts § 368 (c), (d) and (f) (1959). Clearly, the purposes articulated in the Center's charter and other fundamental documents qualify under this standard.

Our conclusion regarding the charitable nature of nonprofit nursing homes generally is bolstered by the legislative history of § 12-81 (75), which was intended to "deal specifically with a problem that ha[d] arisen in the [t]own of Southbury involving a nonprofit nursing home wherein the assessor ha[d] constantly insisted [on] putting the property back on the taxable list even though it has been off the tax list for [eighty] years . . . ." 43 H.R. Proc., Pt. 14, 2000 Sess., p. 4456, remarks of Representative Arthur J. O'Neill. Although the substance of this subdivision is not relevant to the present case, several of the legislators' comments are revealing with respect to nonprofit nursing homes and § 12-81 (7). For instance, during the discussion in which the House of Representatives eventually adopted § 12-81 (75), Representative O'Neill asked: "Does this amendment preclude a licensed nonprofit nursing facility from claiming exemption as a charity under [§] 12-81 sub[division] 7 of the statutes, so long as the facility meets the requirements of this section?" Id., p. 4458. Representative Anne McDonald, a member of the Finance, Revenue and Bonding Committee, answered "no." Id., p. 4459. This exchange indicates that the legislature intended for nonprofit nursing homes generally to be considered "charitable," as long as the other requirements of § 12-81 (7)—e.g., exclusive use—are met. This inference was made explicit in the committee hearing on what later became § 12-81 (75), when Representative Richard O. Belden stated: "I think most of us assume that nonprofit nursing homes were tax-exempt." Joint Standing Committee Hearings, Finance, Revenue and Bonding, Pt. 2, 2000 Sess., p. 405.

exempt from property taxes in part because each resident was required to pay an "up-front fee" of $73,000 for the privilege of occupying a unit. Id., 720–22. Furthermore, residents were charged a monthly maintenance fee of $350, and were eligible to remain in their unit only as long as they could afford this fee and live without assistance. Id. The plaintiff corporation's purpose in *United Church of Christ* was to provide comfortable housing to those senior citizens who could afford the substantial fees and who were healthy enough to live without assistance. Id., 722. The Center's corporate purpose of providing long-term care to the chronically ill elderly regardless of financial status is readily distinguishable from the purpose of the plaintiff corporation in *United Church of Christ*. Thus, in this context, the most we can draw from *United Church of Christ* are general principles regarding our modern conception of charity.

In this respect, we articulated, consistent with our precedents, a very *broad* notion of the term "charitable" in *United Church of Christ*: "This court has recognized that the definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. . . . It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self-supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens." (Citation omitted; internal quotation marks omitted.) Id., 719, quoting *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan*, supra, 147 Conn. 514. We continue to believe that this is the proper approach. In sum, therefore, we conclude that the present case is factually distinct in important ways from *United Church of Christ* and that, pursuant to the general prin-

ciples outlined in that case, the Center's charitable nature is evident from the face of its corporate documents.[31]

## B

### Self-Supporting Nature of the Institution

The second factor that we have considered is that, in order to serve a charitable purpose, an organization must not be completely self-supporting. E.g., *Common Fund* v. *Fairfield*, 228 Conn. 375, 383, 636 A.2d 795 (1994). This factor has been considered to a lesser extent than the primary statutory requirement, and the ad hoc nature of its utilization has led to some confusion. In this context, the town points to the trial court's finding that the "Center does not receive, nor is it in need of, outside financial support in the operation of the skilled nursing home facility." It is on this finding that the town rests its claim that the facility is self-supporting and thus not charitable. We do not agree.

This court has considered the "self-supporting" requirement in three prior cases, and in none of those cases is it particularly well-defined.[32] Generally speaking, we have concluded that *entirely* self-supporting organizations are not charitable in nature. For instance, in *Common Fund*, we stated that, "[f]or the purpose of determining eligibility for a property tax exemption, a Connecticut property owner is not 'a corporation organized exclusively for . . . charitable purposes' . . . if

---

[31] We also note the unchallenged testimony of Monsignor West regarding the goals of the Center: "[T]he primary thing is to bring comfort to people [who] are older, people [who] are sick, to let them not only be comfortable healthwise but spiritually. And so we try to give them comfort in a spiritual way, which kind of helps them to overcome their physical suffering also."

[32] Indeed, even placing it in its proper analytical context is difficult, as the concept touches both the organizational and operational aspects of a nonprofit corporation. Thus, the notion of "self-supporting" could just as appropriately be discussed in the exclusive use analysis in part II of this opinion.

it is entirely self-supporting." (Citation omitted.) *Common Fund* v. *Fairfield*, supra, 228 Conn. 383. In *Common Fund*, we held that a nonprofit corporation that managed investment funds, for a fee, solely for tax-exempt schools, colleges and universities, was not exempt from property taxes under § 12-81 (7). Id., 382–84. The plaintiff in *Common Fund* managed assets of approximately $12 billion, and its chief executive officer received an annual salary of $500,000. Id., 378. Importantly, there was no evidence that the plaintiff in *Common Fund* received any charitable contributions, and it appears to have supported itself entirely on the investment fees that it charged to its institutional clients. See id., 383.

The connection between the receipt of outside charitable support and the notion of a charitable organization not being self-supporting was made even more explicit in *Waterbury First Church Housing, Inc.* v. *Brown*, supra, 170 Conn. 556. In *Waterbury First Church Housing, Inc.*, we evaluated the claim of a nonprofit corporation involved in providing housing for the elderly that it should be exempt from the sales and use tax because it was a charitable organization. Id., 557. We noted that "the requirement that the exempt organization's income be based to some measureable extent on sums coming from private sources which are spent for the public weal remains." (Internal quotation marks omitted.) Id., 563. We concluded that "[i]t [did] not appear from the record that the plaintiff [was] the beneficiary of *any* gifts from private sources, and the *only funds* which it ha[d] to distribute consist[ed] of rental income from its tenants and the federal subsidies which it receive[d]." (Emphasis added.) Id., 564. In holding that the plaintiff was not entitled to the tax exemption, we were specifically concerned that we could not find, "on the record before us, that the plaintiff ha[d] shown sufficient private intervention and private effort to earn charitable

status. . . . The plaintiff's enterprise to provide needed low-cost housing to a certain segment of [the] population with the assistance of the federal government was intended to be self-supporting, without any indication that gifts or charity [was] involved." (Citation omitted.) Id., 564–65.

Finally, in *United Church of Christ* v. *West Hartford*, supra, 206 Conn. 711, we considered a tax exemption claim for property being used for an elderly housing project. See id., 713–14. The cost of constructing and maintaining the project was to be borne almost exclusively by the prospective residents, who each were required to pay an up-front fee of $73,000 for the privilege of occupying a unit. Id., 715. Importantly, each resident was entitled to dwell in the subject housing only as long as he or she was able to live there independently. Id. In addition, each resident was to be charged a monthly fee of $350, which covered all of the required maintenance on the property. Id. In holding that the plaintiff corporation's property did not qualify for a charitable exemption under § 12-81 (7), we noted that "the [plaintiff corporation] had failed to prove that the project [was] not [then] self-supporting. The plaintiff [corporation was] under no legal obligation to provide any services that would impose any significant financial burden on it." Id., 721.

A common thread in each of these cases is that the organizations in question were designed from the outset to be self-supporting. In every case in which we determined that the institution in question failed to meet the requirement that it not be self-supporting, we noted that there was *no* reliance on, or expectation of, private charitable support. In other words, to constitute a charitable organization, the entity must be structured in such a way that it is intended to function with the aid of at least some private charitable support and must, in fact, seek out and receive such support. We also agree with

the Pennsylvania Supreme Court, however, which stated, in a similar context, that, "it is not indispensable that the institution be *maintained* by charity . . . . [O]ne would have to be removed from modern-day realities to believe that such costs [of elderly health care] are easily subsidized [by charitable donations], even in part." (Emphasis added; internal quotation marks omitted.) *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, 536 Pa. 478, 489, 640 A.2d 380 (1994).

In this case, the trial court's finding that the "Center does not receive, nor is it in need of, outside financial support in the operation of the skilled nursing home facility" contradicts uncontested documentary and testimonial evidence presented at trial, and is clearly erroneous. The record plainly indicates that, for each of the years in question, the Center received "outside financial support" in the form of private charitable contributions and testamentary gifts. For the years 2000 through 2005, the Center's financial statements reflect individual contributions totaling $41,136, $18,584, $56,563, $33,706, $30,668, and $51,755, respectively. The facility's administrator testified that these financial contributions were "extremely helpful . . . for [the Center's] bottom line, you know, to make [the Center's] debt service [coverage] ratio, definitely." This evidence alone is sufficient to contradict the trial court's finding.[33] The record also

---

[33] In his concurrence and dissent, Justice Schaller notes that the Center's financial statements report "outside financial donations of $33,706 in 2003, $30,668 in 2004, and $51,755 in 2005." He concludes that, because the Center's reported contributions to the diocese exceed the amount of these private donations, "the trial court's finding that the Center was not in need of outside financial support was supported by the record and is not clearly erroneous." Justice Schaller fails to note, however, the portion of the finding that is flatly contradicted by the financial statements, namely, that the "Center *does not receive* . . . outside financial support . . . ." (Emphasis added.) This is the specific finding that the evidence regarding the contributions was cited to refute. The element of "need" is essentially irrelevant to the analysis of whether a corporation is organized exclusively for a charitable purpose. The concept of "need" in this context is a slippery one. For instance, we surely cannot, as a matter of sound public policy, require charitable

indicates that the Center receives significant financial assistance from the diocese in the form of a reduction in the cost of health insurance for its employees, up to $120,000 in savings for fiscal year 2006. Finally, the trial court ignored the value of the significant in-kind contributions of volunteers to the Center. Although reasonable people can disagree over the relative *significance* of this outside support, the substantial weight of the unchallenged evidence convinces us that the Center does indeed receive valuable in-kind volunteer contributions and financial aid in support of its charitable goals and, therefore, is not self-supporting.[34]

organizations to operate at the very margin of insolvency in order to maintain their charitable status and tax exemption. Private charitable donations are, of course, a highly unpredictable source of funding, and it would be irresponsible, in our view, to require a charitable organization to depend on them to the extent that Justice Schaller suggests. This is especially true in the complex, costly and heavily regulated health care industry. It would be impractical and naive to judge the charitable nature of a facility such as the Center solely on the basis of its level of reliance on private contributions, and we decline to do so. See *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 489. Justice Schaller's concern that we are thus "enlarg[ing] the scope of potentially exempt entities"; footnote 9 of the concurring and dissenting opinion; is incorrect, as it fails to recognize that this is but one factor in the analysis; an entity seeking tax exemption still must prove that it has an exclusively charitable purpose and that it is using its property exclusively in furtherance of that purpose. Justice Schaller's approach would, in fact, unduly *restrict* the scope of potentially exempt entities. Indeed, it is hard to imagine a hospital in this state that would qualify for a charitable tax exemption under Justice Schaller's conception of the requirement that a charitable entity not be self-supporting. Moreover, such entities would not know, from year to year, whether they qualified for an exemption until they knew what their revenues, expenses and contributions amounted to. We do not believe that this unwieldy approach is an appropriate method for determining if an organization seeking a tax exemption has an exclusively charitable purpose.

[31] We place little importance on the facility administrator's testimony on cross-examination that the Center is self-supporting:

"Q. And wouldn't you agree with me then that [the Center] is self-supporting?

"A. Yes."

To the extent that this statement is relevant, it represents a legal conclusion that the witness was not qualified to make. Furthermore, there is no indication that the trial court relied on this testimony in making its finding.

The town claims that the fact that the Center often has enjoyed excess revenue bolsters the town's contention that the Center is self-supporting. In this regard, the trial court found that the "Center generates an excess of operating income over operating expenses and for several years made payments to the diocese that are related to lease payments although the Center is in possession of the subject property by virtue of a quit-claim deed, not a lease." With respect to the Center's excess revenue, we cannot see how that is relevant to the question of whether the facility is organized and exclusively used for a charitable purpose. We do not believe that the legislature could have intended the tax exemption statutes to create a perverse incentive for charitable organizations to run inefficiently and to operate at a loss in order to preserve their tax-exempt status. We agree wholeheartedly with the well reasoned opinion of the Michigan Supreme Court on this issue: "[T]he idea that an institution cannot be a charitable one unless its losses exceed its income places an extraordinary— and ultimately detrimental— burden on charities to continually lose money to benefit from tax exemption. A charitable institution can have a net gain—it is what the institution does with the gain that is relevant." *Wexford Medical Group* v. *Cadillac*, supra, 474 Mich. 218. A nonprofit charitable entity can take in surplus revenue without losing its status as a charity, provided it uses those funds in a manner not inconsistent with its charitable purpose. See, e.g., *Nuns of the Third Order of St. Dominic* v. *Younkin*, 118 Kan. 554, 559–60, 235 P. 869 (1925) (as long as revenue is used to support charitable operations and not for pecuniary gain of individuals, excess revenue does not defeat charitable purpose).

We thus examine how the Center uses its excess revenue. The record reflects that the surplus revenue of the Center primarily is used to maintain compliance with the requirements of its CHEFA mortgage. The

funds so used must be sequestered in separate trust accounts and generally cannot be used for operational expenses. In fact, the Center's agreement with CHEFA specifically mandates that the Center maintain a debt service coverage ratio of 1.25:1; that is, the Center *must* ensure that its revenue exceeds its expenses by an amount that is at least 25 percent greater than its annual CHEFA mortgage payment, or risk facing a potentially existential default.[35] We cannot conclude that the legislature intended to establish a loan facility for nonprofit enterprises while simultaneously creating a situation in which these nonprofit enterprises could jeopardize their tax-exempt status by taking advantage of this funding opportunity and maintaining compliance with the mortgage agreement. See, e.g., *In re William D.*, 284 Conn. 305, 313, 933 A.2d 1147 (2007) ("the legislature is always presumed to have created a harmonious and consistent body of law" [internal quotation marks omitted]).

The fact that the Center "for several years made payments to the diocese" likewise does not influence our determination of whether the Center is self-supporting or whether its purpose is ultimately charitable. The town's reliance on this finding in support of its argument that the Center is self-supporting highlights a flaw inherent in the approach of the trial court and implicitly

[35] *General Statutes § 10a-188 authorizes CHEFA to issue bonds to fund such projects as the construction of the Center and to require "[a] sufficient amount of the revenues derived in respect of a project, except such part of such revenues as may be necessary to pay the cost of maintenance, repair and operation and to provide reserves and for renewals, replacements, extensions, enlargements and improvements as may be provided for in the resolution authorizing the issuance of any bonds of the authority or in the trust agreement securing the same, shall be set aside at such regular intervals as may be provided in such resolution or trust agreement in a sinking or other similar fund which is hereby pledged to, and charged with, the payment of the principal of and the interest on such bonds as the same shall become due, and the redemption price or the purchase price of bonds retired by call or purchase as therein provided."*

urged throughout the town's brief. We cannot determine whether an organization generally is self-supporting or charitable simply by focusing on disparate facts taken out of their surrounding context. As we note in the exclusive use context in part II of this opinion, the correct approach is much more comprehensive. We evaluate "the overall nature of the institution, as opposed to its specific activities," to ascertain its charitable nature. *Wexford Medical Group* v. *Cadillac*, supra, 474 Mich. 213. A single expenditure listed on a financial report, even if it could be characterized as noncharitable, cannot form the basis of a conclusion that the Center is self-supporting. Rather, as we discussed previously, the focus must be on the organization's sources of income and to what uses that income is generally put. In this case, we cannot say that a single charitable donation to an affiliated, nonprofit benefactor is sufficient, when considered in context, for us to conclude that the Center is entirely self-supporting.

We note that both the trial court's decision and the town's brief rely on language culled from prior cases quoting a passage in § 12-88 that often has been misunderstood and misapplied, and this may have led the trial court to rely too heavily on the fact that the Center charges for its services and often has a surplus of revenue over expenses.[36] General Statutes § 12-88, an adjunct to many subdivisions in § 12-81, including subdivision (7), provides in relevant part: "Real property belonging to, or held in trust for, any organization mentioned in subdivision (7) . . . of section 12-81, which real property is so held for one or more of the purposes

---

[36] The town, in its brief, misreads the first sentence of § 12-88 by divorcing it from its proper context: "All property that qualifies under [§] 12-81 (7) must also satisfy the first sentence of . . . § 12-88 in that the property 'must produce no rent, profits or income.'" As we explain in the text of this opinion, this misconstruction of § 12-88 began in *United Church of Christ* v. *West Hartford*, supra, 206 Conn. 711, and is based on a misreading of the statute.

stated in the applicable subdivision, and from which real property no rents, profits or income are derived, shall be exempt from taxation . . . ." Taking this clause out of context, several of our cases; see, e.g., *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* supra, 262 Conn. 221; have grafted onto the tax exemption analysis a requirement that the property for which exemption is sought produce "no rent, profits or income." (Internal quotation marks omitted.) Id. As we attempted to explain in *Isaiah 61:1, Inc.* v. *Bridgeport,* supra, 270 Conn. 85–88, however, this provision is directly subordinate to the following clause of the statute: "though not in actual use therefor by reason of the absence of suitable buildings and improvements thereon, if the construction of such buildings or improvements is in progress." General Statutes § 12-88. Thus, when the statute is read in its entirety, it makes clear that the restriction relating to "rents, profits or income" is only relevant if the property is not being used for a charitable or other exempt purpose "by reason of the absence of suitable buildings and improvements thereon, if the construction of such buildings or improvements is in progress." General Statutes § 12-88. Unless such a specific claim is raised, this portion of § 12-88 simply is irrelevant to the analysis under § 12-81 (7).[37] Accordingly, we conclude that the Center is not self-supporting and that the trial court's findings to the contrary are clearly erroneous.

## C

### Relieving a State Burden

The third factor we have considered in determining whether an entity claiming a charitable tax exemption is organized for a charitable purpose is whether the

[37] To the extent that cases such as *United Church of Christ* v. *West Hartford,* supra, 206 Conn. 718, and *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* supra, 262 Conn. 221, suggest otherwise, they are overruled.

organization's activities relieve the state of a burden it otherwise would be compelled to bear. The town claims that the Center does not relieve the state of any such burden because it applies for, and accepts, taxpayer funding through the Medicare and Medicaid programs. The Center argues that furnishing services to the elderly who cannot afford such services is charitable, despite the existence of state funding, because such funding is, in may cases, deficient. We agree with the Center.

The trial court found that "[t]he operation of the . . . Center does not lessen the burden on society or taxpayers since it receives compensation for services rendered." Closely related to this finding is the court's declaration that "[t]here was no financial burden from the operation of the facility either on the . . . Center or on the diocese." These findings are clearly erroneous. The requirement that a charitable entity relieve a public burden is inextricably tied to the public policy justifying the granting of such exemptions to charitable institutions: "[E]xemptions are made, and can be made lawfully, only in recognition of a public service performed by the beneficiary of the exemption. They are not bestowed, as is too often unthinkingly supposed, as a matter of grace or favor. . . . [T]hey are granted in aid of the accomplishment of a public benefit and for the advancement of the public interest. It is in recognition of their position as an agency in the doing of things which the public, in the performance of its governmental duties, would otherwise be called upon to do at its own expense, or which ought to be done in the public interest and without private intervention would remain undone." *Corbin* v. *Baldwin*, 92 Conn. 99, 107, 101 A. 834 (1917); see also *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 85 ("when a charitable organization does nothing to make it less likely that [the individuals it services] will become burdens on society and more likely that they will become useful citizens, the subject

property cannot qualify for a tax exemption" [internal quotation marks omitted]), quoting *United Church of Christ* v. *West Hartford*, supra, 206 Conn. 719.

This requirement compels an organization seeking charitable status, and the advantage of tax exemption that that status entails, to give something to the state in return for the privilege, either by relieving it of a financial burden or by pursuing a publicly mandated moral obligation. See *Corbin* v. *Baldwin*, supra, 92 Conn. 107. The mere fact that the state is not *completely* relieved of any obligation, and may even partially subsidize the activity, does not necessarily defeat a claim for tax exemption.

Although this court has not directly addressed this requirement with respect to the receipt of state funds by a nursing home, our analysis is informed by the approach taken in other jurisdictions. For instance, in a well reasoned opinion, the Pennsylvania Supreme Court stated that the "test of whether an institution has relieved the government of some of its burden does not require a finding that the institution has fully funded the care of some people who would otherwise be fully funded by the government. The test is whether the institution bears a substantial burden that would otherwise fall to the government. [When a] home pays a substantial portion of the cost for Medicaid patients, who comprise about half of its residents . . . this fulfills the requirement that the home relieve the government of some of its burden." *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 487. The Michigan Supreme Court has similarly declared: "[R]elieving [patients] from disease or suffering *is* lessening the burden of government. In other words, [the purportedly charitable entity] does not have to prove that its actions lessen the burden of government. Rather, it has to prove . . . that it reliev[es] [its patients] from disease, suffering or constraint, which

is, by its nature, a lessening of the burden of government. In any event, even though [the entity] helps to enroll patients in Medicare and Medicaid, it still subsidizes the cost of care in light of the government's underpayment, thus lessening the government's burden of covering the full cost of a person's care." (Emphasis in original; internal quotation marks omitted.) *Wexford Medical Group* v. *Cadillac*, supra, 474 Mich. 219; see also *Catholic Charities of the Diocese* v. *Pleasantville*, supra, 109 N.J. Super. 481 ("[the plaintiff nursing home] performs a charitable function that benefits the public-at-large inasmuch as the burden of taxation is lessened by obviating the necessity on the part of government to construct facilities to accommodate the poor who are unacceptable to or who cannot afford the rates charged by nursing homes operating for profit"); cf. *Evangelical Lutheran Good Samaritan Society* v. *Gage*, supra, 181 Neb. 836 (pure charity is rare in health care context because "assistance is available to the poor under [state] programs").

The Center clearly undertakes a "financial burden" by virtue of the fact—which the trial court expressly recognized—that reimbursement under the Medicaid program "does not fully [compensate] the [Center] for actual patient care costs."[38] This funding gap relieves the state of having to shoulder the entire financial burden of caring for the indigent elderly. Moreover, under state law, as well as its own policy, the Center is prohibited from discriminating on the basis of a patient's ability to pay. Thus, because the Center cannot plan its patient mix in advance, it cannot predict with any certainty how large a gap in funding may exist for any

[38] As the Connecticut Association of Not-for-Profit Providers for the Aging notes in its amicus brief, "[i]n 2005, the average gap between the 'allowable costs' of long-term care and the amount reimbursed by Medicaid for that care in Connecticut was $17.58 per patient day. . . . The gap between actual cost of care, which exceeds 'allowable costs,' and the amount reimbursed by Medicaid is larger still." (Citation omitted.)

given period. The fact that the Center may pass on some of this shortfall to private paying patients in the form of higher rates[39] is insignificant in light of the uncertain number of such patients and the fact that these higher rates merely hasten the pace at which such patients spend down their assets and become reliant on the Medicaid program themselves.[40] The trial court completely ignores this substantial burden in its memorandum of decision.

It is important to note that, as long as a corporation is "organized and operated for the public welfare without profit to itself or any individual . . . [t]he mere fact that some patients pay for part or all of their care does not destroy its charitable character." *Boardman* v. *Burlingame*, 123 Conn. 646, 653–54, 197 A. 761 (1938). Indeed, the trial court's conclusion that receiving state subsidies for health care services means that no public burden is relieved ignores the realities of the modern health care delivery system in the United States and

[39] We note that the record is very sparse with regard to exactly how much private paying patients are charged for their care beyond actual cost. We are unable to find direct factual support in the record for the trial court's finding that the "Center covers the unreimbursed costs attributed to Medicaid patients by charging private pay[ing] patients not only for the actual cost of care . . . but an additional amount for losses incurred from Medicaid patient care." We located only one vague statement by the facility administrator that can be read to support this conclusion:

"Q. And so is it fair to say that you try to make it up [the gap in Medicaid funding] on the private rates?

"A. Well, we have to make up our—we do make up our money. The private rates will reflect more of the true cost of the care."

In any case, we assume that, to remain competitive for private paying patients, the Center's rates must be commensurate with those charged by similar nursing homes in the state.

[40] The amicus brief filed by the Connecticut Association of Not-for-Profit Providers for the Aging cites an unchallenged statistic from the state office of policy and management indicating that "[m]ore than 30 [percent] of all Connecticut nursing home patients on Medicaid entered the nursing home paying from their personal income and assets before they spent down nearly all of their resources."

the substantial role that the federal and state governments play in that system.[41] "In modern America it is hard to find any person in need of nursing home care who is uninsured, unable to pay, and wholly ineligible for government support in the form of Medicare or Medicaid coverage. . . . The decision to accept Medicaid payments to help defray the cost of care for residents is perfectly consistent with a finding that the nursing home advances a charitable purpose." *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 483.

The trial court also found that the "Center does not admit indigent patients at the expense of the . . . Center since all patients at the Center are either supported by Medicare, Medicaid or self-supporting." This finding also ignores the realities of modern health care. First, under the current health care system in this country, accepting those patients who are eligible, or keeping those who thereafter become eligible, for Medicaid *is* the modern equivalent of caring for the indigent.[42] "[T]he absence of indigent residents who receive no government support is not surprising, and is certainly not, standing alone, enough to disqualify a nursing home from an exemption as a purely public charity." *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 483.

In order to qualify for Medicaid, an individual must establish that he or she is financially needy by virtue

---

[41] The town states in its brief that "[t]here is no charity when one collects state and federal taxpayer dollars for services rendered." Not only does this statement ignore the realities of the modern health care system, but it also is incorrect as a matter of law. The town seems to ignore our decision in *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 69, in which we concluded that the plaintiff corporation's facility, a halfway house for prison inmates, was tax-exempt even though it received 90 percent of its funding through an agreement with the state department of correction. Id., 70, 71–72.

[42] We note that the amicus brief repeatedly refers to Medicaid patients as indigent.

of the lack of significant income and assets. See 42 U.S.C. § 1381 et seq. (2000 & Sup. V 2005). Indigence is essentially a prerequisite for Medicaid eligibility, and the care of such poor elderly is clearly charitable. See *Waterbury First Church Housing, Inc.* v. *Brown*, supra, 170 Conn. 565 ("This is not to say that all residents [of the plaintiff corporation's elderly housing] must be indigent or that the acceptance of payment from some will defeat tax exemption. It is to say that the institution must be one whose properties and assets are pledged in perpetuity to the relief of persons in financial need and to their assistance in obtaining the care they must have to prevent their becoming a burden on society." [Internal quotation marks omitted.]); cf. *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 86 ("an organization's use of its property exclusively for charitable purposes is not negated by the organization's 'renting' of the property to its occupants as long as 'the use [is] exclusively for [charitable] purposes [and not] for some other purpose' "), quoting *Hartford Hospital* v. *Hartford*, supra, 160 Conn. 377; *Boardman* v. *Burlingame*, supra, 123 Conn. 654 ("[t]he mere fact that some patients pay for part or all of their care does not destroy [the health care provider's] charitable character").

We conclude that the Center's receipt of taxpayer funded government assistance alone is irrelevant to the question of whether it relieves a burden that would otherwise be borne by the state. The trial court specifically found that "Medicaid does not fully reimburse the [Center] for actual patient care costs." This funding shortfall and the accompanying risk that payments from private paying patients and charitable contributions will fail to make up for the funding shortfall are sufficient to satisfy the requirement that the Center relieve a burden on society.[43] As the Pennsylvania Supreme Court

---

[43] The trial court also concluded that, "[i]f the . . . Center did not provide the skilled nursing services that it does, the alternative is not for the government to take over this obligation but, rather, other similar facilities." This

has recognized, "if the nursing home does not accept an aged Medicaid patient whose allotment does not fully cover his costs, the public will fund the patient's care at a public institution because such care is not viewed as a privilege . . . but is deemed to be a public responsibility. The aged in need of medical care are legitimate objects of charity . . . . The partial subsidy of the costs of caring for an elderly patient is unquestionably a charitable act." *St. Margaret Seneca Place v. Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 485. We conclude, therefore, that the trial court's determination that the Center does not relieve a burden on society is clearly erroneous.

## D

### Private Paying Patients

The trial court found that "[s]ervices provided to private pay[ing] patients . . . are simply not charitable services . . . ." Both the town and the court seem to equate the term "charitable" with "free," and conclude that the acceptance of private paying patients renders the Center's purpose not exclusively charitable. We do not agree. The trial court's conclusion that merely charging a fee to those who have the means to pay renders the Center's purpose not exclusively charitable is not in keeping with our precedents, and is belied by the realities of the modern health care system.

This court never has held that accepting payment or charging a fee, without more, alters the character of a charitable or otherwise tax-exempt organization. In

conclusion is speculative and unsupported by any facts in the record. There is no evidence of how many "similar facilities" are present in the same geographical vicinity of the Center and no indication of what capacity they might have, assuming they exist, to cope with the excess demand that would be created if the Center were to shut its doors. Nor does the court explore what sacrifices local families would have to make if their elderly relatives were forced to relocate to facilities elsewhere in the state.

*Yale University* v. *New Haven*, 71 Conn. 316, 42 A. 87 (1899), we declared what common sense requires: "A church is none the less a church, because the worshippers contribute to the support of services by way of pew rent. A hospital is none the less a hospital, because the beneficiaries contribute something towards its maintenance. And a college is none the less a college, because its beneficiaries share the cost of maintenance . . . ." Id., 328. Likewise, a charitable, nonprofit nursing home is no less charitable simply because some patients pay for all or part of the cost of their care.

The cases from our sister jurisdictions are consistent with this approach. For instance, the Ohio Supreme Court has described the situation plainly: "It is the use of property rather than the fact that revenues are collected and received from property which is controlling. . . . Nor do reasonable charges exacted from beneficiaries of a charitable institution detract from its eleemosynary character." (Citations omitted.) *Bowers* v. *Akron City Hospital*, 16 Ohio St. 2d 94, 96, 243 N.E.2d 95 (1968). Other states that have examined this issue are in accord. See, e.g., *State Board of Tax Commissioners* v. *Methodist Home for the Aged of the Indiana Conference of the Methodist Church, Inc.*, 143 Ind. App. 419, 425, 241 N.E.2d 84 (1968) ("[t]o qualify as a charity does not require that [the entity] have an exclusive relationship to the poor, and its charitable status is not destroyed by the charging of fees for admission and maintenance" [internal quotation marks omitted]), quoting *Bozeman Deaconess Foundation* v. *Ford*, 151 Mont. 143, 148, 439 P.2d 915 (1968); *Knox County Property Tax Assessment Board of Appeals* v. *Grandview Care, Inc.*, supra, 826 N.E.2d 184 ("With respect to homes or facilities that provide comfort and care to the aged . . . 'charitable' is not necessarily the equivalent of 'free.' . . . [T]he fact that residents of such facilities are charged for their stays does not necessarily negate the charitable

purpose of the institution . . . ."); *Nuns of the Third Order of St. Dominic* v. *Younkin*, supra, 118 Kan. 559 ("[t]he fact that [a nonprofit hospital] charges and receives pay for patients able to pay, does not detract from the charitable nature of the services rendered"); *Wexford Medical Group* v. *Cadillac*, supra, 474 Mich. 206 ("[I]f we were to accept the [city's] position that to be considered charitable, the petitioner [health care provider] could accept no fees from patients, we would be adopting the untenable position that persons who dedicate a hospital to the public must pay taxes on that hospital unless they maintain the same from their private means. . . . [Rather] a corporation is sufficiently charitable to entitle it to the privileges of [tax exemption] when the charges collected for services are not more than are needed for its successful maintenance." [Citation omitted; internal quotation marks omitted.]); *Evangelical Lutheran Good Samaritan Society* v. *Gage*, supra, 181 Neb. 836 (charity includes "something more than . . . the relief of poverty and distress, and [courts] have given it a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits" [internal quotation marks omitted]); *St. Margaret Seneca Place* v. *Board of Property Assessment, Appeals & Review*, supra, 536 Pa. 486 ("[t]he requirement that an institution donate or render gratuitously a substantial portion of its services does not imply a requirement that the institution . . . provide wholly gratuitous services to some of its residents"). Accordingly, the Center's acceptance of private paying patients does not detract from the fact that it is organized exclusively for a charitable purpose.

E

Summary

There are three elements relevant to our analysis of the first *Isaiah 61:1* factor. The first element of the

analysis is derived from the first clause of § 12-81 (7), which requires that a nonprofit corporation seeking exemption from local property taxes as a charity be "organized exclusively for . . . charitable purposes . . . ." General Statutes (Rev. to 2003) § 12-81 (7). A corporation's purpose can be gleaned from its corporate charter and bylaws. We apply a broad interpretation to the meaning of the term "charitable," and are guided by the two other factors in our analysis. The second factor requires that the organization not be entirely self-supporting, which is determined by whether the organization's purpose is furthered, at least in part, by the receipt of charitable donations, including, but not limited to, cash and volunteer services. Our analysis of this factor is unaffected by the fact that a charitable, nonprofit health care provider seeks compensation from those who can pay or, at times, realizes an excess of revenue over expenses. Finally, the organization's purpose must express a goal the fulfillment of which relieves a burden on society. The receipt of state funding through the Medicare and Medicaid programs does not defeat this requirement.

We are convinced, on the basis of the foregoing analysis, that the trial court's determinations that the Center "is simply not a charity" and that "its original purpose was not charitable" are clearly erroneous, legally incorrect and unsupported by the evidence in the record. To the contrary, the Center's corporate charter, bylaws and mission statement evince a classic charitable purpose of operating a nonprofit "chronic and convalescent care nursing home" in order "to fulfill the goals and aspirations of the Roman Catholic Church in its ministry and service to the elderly and to those who are ill located in the [d]iocese . . . regardless of their race, color, creed or religion." These purposes fall well within the broad parameters set forth in previous cases and clearly represent purposes befitting an exclusively charitable

organization. Moreover, the undisputed evidence in the record indicates that the Center is not self-supporting and does, in fact, provide a valuable benefit to the taxpayers of the state.

## II

## EXCLUSIVE USE FOR CHARITABLE PURPOSES

We next undertake the second step of our analysis under § 12-81 (7), namely, whether the real property at issue is "used exclusively for carrying out [the corporate entity's] charitable purposes . . . ." *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 77; see also General Statutes (Rev. to 2003) § 12-81 (7) (to be exempt, property must be "used exclusively for carrying out one or more of such purposes"). The parties disagree over the application of the term "exclusive" to the facts of this case, and our prior cases have been less than clear in explaining exactly what that term means. The trial court found that the Center's property is not used exclusively for a charitable purpose. The town agrees and, in its argument to this court, focuses on the fact that the Center provides short-term rehabilitative services to some of its patients, which, according to the town, defeats the exclusivity requirement. The Center responds by downplaying the significance of its rehabilitative operations[44] and by taking a broad view of its charitable purpose, urging this court to conclude that providing short-term rehabilitative care is within the Center's charitable purpose of "provid[ing] [health] care

[44] In our view, the Center mischaracterizes the facts in the record when it states in its brief that "[a] small percentage of beds is used to provide rehabilitative care for short-term patients . . . ." Although the record is not entirely clear as to the average number of beds used for such purpose during the period in question, the facility administrator testified that the ultimate goal was to have forty beds utilized for short-term care, and that the actual number so used as of the trial date was approximately twenty-three. We have difficulty accepting the characterization of 19 to 33 percent of existing beds as a "small percentage . . . ."

. . . ." We agree with the town that the Center is not using its property exclusively in furtherance of its charitable purpose because the provision of short-term rehabilitative care to the general public is outside the scope of that charitable purpose.

Our discussion will proceed in two parts. First, we will examine the meaning of the term "used exclusively." Next, we will examine the Center's short-term rehabilitative care services in the context of our understanding of this requirement, as well as the significance of such noncharitable use on the Center's tax status in light of the apportionment provision of § 12-88.

We first endeavor to define the statutory term "used exclusively" and apply it to the facts of this case. This is an intensely fact-bound inquiry. "Whether the property for which exemption is claimed is actually and exclusively used for [charitable] purposes must be determined from the facts of the case." *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 147 Conn. 514; see also *Lutheran Home, Inc.* v. *Board of County Commissioners,* 211 Kan. 270, 276–77, 505 P.2d 1118 (1973) ("a case involving a determination of that which is charitable must be decided upon its own particular facts or circumstances"). Although the legislature has not defined the exact meaning of the term "used exclusively," and the term seems to have heretofore defied precise definition, our analysis is guided by the strict construction that we must apply to statutory provisions bestowing on a taxpayer the privilege of a tax exemption. E.g., *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* supra, 262 Conn. 220. In order to satisfy this exclusivity requirement, "[a]n institution must be exclusively charitable, not only in the purposes for which it is formed and to which its property is dedicated, but also in the *manner and means* it adopts for the accomplishment of those purposes." (Emphasis added; internal quotation marks omitted.) *H.O.R.S.E.*

*of Connecticut, Inc.* v. *Washington,* 258 Conn. 553, 563, 783 A.2d 993 (2001). A closer examination of cases that turn on this issue will be helpful in expanding on this "manner and means" approach.

In *Hartford Hospital* v. *Hartford,* supra, 160 Conn. 371–72, we reviewed a nonprofit hospital's claim that an apartment house it owned, which was located on property adjacent to the buildings actually used to care for patients, was tax-exempt under General Statutes (Rev. to 1964) §§ 12-81 (16)[45] and 12-88. The city of Hartford (city) claimed that the apartment house was taxable because it was occupied by members of the hospital's staff, who paid rent to the hospital, and, thus, it was not used "exclusively for hospital purposes." Id., 371. We recognized, however, that the fundamental issue in the case was "whether the use [of the apartment house] was exclusively for hospital purposes or for some other purpose."[46] Id., 377. Our conclusion that the apartment house was entitled to a tax exemption as property used exclusively for hospital purposes was premised on the fact that "it is *necessary* for the [hospital] to provide housing for a large number of its house staff in close proximity to [the hospital] . . . in order properly to perform its services as a hospital." (Emphasis added.) Id. *Hartford Hospital* thus stands for the proposition that the "exclusively used" test encom-

_____

[45] General Statutes (Rev. to 1964) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

\* \* \*

"(16) Hospitals and sanatoriums. Subject to the provisions of section 12-88, all property of, or held in trust for, any Connecticut hospital society or corporation or sanatorium, provided (a) no officer, member or employee thereof receives or, at any future time, shall receive any pecuniary profit from the operations thereof, except reasonable compensation for services in the conduct of its affairs . . . ."

[46] We found the collection of rent to be irrelevant to our analysis, concluding that "[t]he distinction is not between nonrental and rental but between use exclusively for hospital purposes and nonhospital use." *Hartford Hospital* v. *Hartford,* supra, 160 Conn. 377.

passes those activities that are "necessary for" the primary, tax-exempt purpose. Id. We interpret this to mean that § 12-81 (7) anticipates such peripheral activities as are, in a practical sense, indispensable to the accomplishment of the permissible tax-exempt purpose but that nevertheless are outside the strict scope of that purpose.

This proposition is borne out, albeit indirectly, in *H.O.R.S.E. of Connecticut, Inc.* v. *Washington*, supra, 258 Conn. 553. The plaintiff in *H.O.R.S.E. of Connecticut, Inc.*, was a nonprofit organization dedicated to "the care of all abused, neglected, unwanted and lost domestic hoofed animals; to provide education and training pertinent to the care of hoofed animals for employees, members and officers, and the community as a whole; and to safeguard, advance and promote the safety and well-being of domestic hoofed animals by political, educational and other community activity." (Internal quotation marks omitted.) Id., 556. In carrying out this purpose, the plaintiff used the subject property, at least in part, to board and to rehabilitate abused, neglected or abandoned horses. See id. The plaintiff appealed from the decision of the defendant town of Washington denying it a property tax exemption, and the trial court granted the plaintiff's motion for summary judgment, which the Appellate Court affirmed. Id., 557. We granted the defendant's petition for certification to appeal, with the primary issue being whether there were any material facts in dispute as to whether the plaintiff's property was "used exclusively for charitable purposes . . . ." (Internal quotation marks omitted.) Id., 555.

The defendant argued that the plaintiff's property was not being used exclusively for a charitable purpose because there was evidence that the plaintiff may have boarded some horses commercially in order to make money to support the charitable portion of its operation.

See id., 564. The plaintiff insisted that such boarders formerly were abused or neglected animals that had been adopted but still required rehabilitative care. Id., 565. We concluded that there was a material fact in dispute with respect to "whether the plaintiff use[d] its property exclusively for charitable purposes within the meaning of § 12-81 (7) . . . ." Id. Our conclusion was based on the evidence presented by the defendant, which, construed in the light most favorable to it as the nonmoving party, indicated that at least some of the plaintiff's boarders were "healthy and were not, and never ha[d] been, in need of special care, treatment or rehabilitation that the plaintiff afford[ed] abused, neglected or abandoned horses in accordance with its charitable purpose." Id., 564. Thus, the case was remanded to the trial court to resolve the factual dispute and to determine whether the plaintiff's use of its property was, in fact, dedicated exclusively to its charitable purpose. See id., 564–66. We conclude from these cases that the term "exclusive" must be given its ordinary meaning in light of our strict construction of § 12-81 (7).[47]

[47] We note that the concept of exclusivity has fluctuated somewhat in the course of our jurisprudence. For instance, in *First Unitarian Society* v. *Hartford*, 66 Conn. 368, 34 A. 89 (1895), we determined that a church was still occupied and used exclusively as a church within the meaning of the tax exemption statute even though it defrayed the cost of religious services by "renting its audience-room at other times for lectures, concerts, readings, and other things not inappropriate to be had in a church." Id., 375. We reasoned, on the basis of "[t]he policy on which the exemption of church buildings from taxation is granted"; id.; that the exclusive use requirement did not prohibit the church from "permitting this building [the church hall] to be used for profit, when not needed for those services distinctly called religious services . . . ." Id. This same approach was spelled out, in a different context, a few years later in *Yale University* v. *New Haven*, supra, 71 Conn. 316. In *Yale University*, we again were called on to determine whether certain buildings, not directly used for a tax-exempt purpose, in this case, education, were nonetheless tax-exempt because of their close relationship with the permitted use. We held that not only was Yale University's observatory building itself entitled to tax-exempt status but so too were "[a]ll the dormitories occupied by students, the buildings used as a dining-hall . . . the two houses furnished by the [university] for the officers of

We conclude that the exclusive use requirement of § 12-81 (7) must be strictly construed so as to require a charitable organization seeking the benefit of a property tax exemption to use its property in such a manner that its activities are entirely dedicated to serving its stated charitable purpose.[48] Of course, this does not mean that *any* noncharitable use necessarily will defeat the tax exemption, but the proponent of the exemption must show that such uses are *"necessary for"* the accomplishment of the charitable purpose; (emphasis added) *Hartford Hospital* v. *Hartford,* supra, 160 Conn. 377; cf. *Loomis Institute* v. *Windsor,* 234 Conn. 169, 178, 661 A.2d 1001 (1995) (faculty housing exempt under § 12-81 [7] because it was used "purely to effectuate [the

the observatory, [and] the adjoining land found to be reasonably necessary for the purposes of the observatory . . . ." Id., 334; see also *Loomis Institute* v. *Windsor,* 234 Conn. 169, 178, 661 A.2d 1001 (1995) (renting of school's dormitories and athletic fields to third parties did not defeat exclusive use requirement of § 12-81 [7] when rentals "furthered" school's educational purpose); *Arnold College for Hygiene & Physical Education* v. *Milford,* 144 Conn. 206, 210, 128 A.2d 537 (1957) ("It is well established that the exemption granted is not limited to the buildings used for educational purposes in the limited and restricted sense. It extends to all of the property the use of which is *incidental to* education . . . ." [Emphasis added.]).

*Yale University, Loomis Institute* and *Arnold College for Hygiene & Physical Education* were decided according to the more liberal approach to statutory construction that previously had been applied to educational institutions claiming a property tax exemption and are thus inapposite to the present case in terms of defining the term "exclusive use." See footnote 22 of this opinion. Furthermore, in *First Unitarian Society,* this court reasoned that the renting of the church's "audience-room" when not in use for religious services allowed the church to provide such services for free, thus promoting the legislative policy of the "encouragement of religion" underlying the tax exemption. Because we were dealing with a different statutory exemption under different circumstances, we find that the reasoning of *First Unitarian Society* also is unhelpful to our analysis in the present case.

[48] We refer specifically to the import of the "used exclusively" requirement of § 12-81 (7). In the discussion that follows, we will explain the effect of the apportionment provision of § 12-88, which we read to require that the *portion* of the property for which a tax exemption is sought be used exclusively in furtherance of the taxpayer's charitable purpose. As to such portion, the exclusivity analysis we outline in the text of this opinion is relevant.

school's] educational purposes"); or, on the other hand, are *merely incidental* to such a purpose. See, e.g., *Topeka Presbyterian Manor, Inc.* v. *Board of County Commissioners*, 195 Kan. 90, 95 402 P.2d 802 (1965) ("the expression 'used exclusively' . . . has reference to the primary and inherent use of the property as against a mere secondary or incidental use"), overruled in part on other grounds by *Lutheran Home, Inc.* v. *Board of County Commissioners*, supra, 211 Kan. 270; *Evangelical Lutheran Good Samaritan Society* v. *Gage*, supra, 181 Neb. 835 ("[t]he primary or dominant use, and not an incidental use, is controlling in determining whether property is exempt from taxation" [internal quotation marks omitted]); *Hilltop Village, Inc.* v. *Kerrville Independent School District*, supra, 426 S.W.2d 947 ("[n]or will the incidental uses of the properties for the operation of guest facilities, a canteen, a beauty shop and vending machines defeat the exemption"). In this respect, we are in accord with the Michigan Supreme Court, which, in determining whether an institution is charitable, declared that "it is the overall nature of the institution, as opposed to its specific activities, that should be evaluated." *Wexford Medical Group* v. *Cadillac*, supra, 474 Mich. 213. We continue to believe that any analysis of a property's "exclusive use" under § 12-81 (7) must consider the "manner and means" employed in pursuit of the charitable goal within the specific facts and circumstances of each case.

Returning to the present case, we agree with the trial court that the Center's provision of short-term rehabilitative services to patients of all ages, drawn from the community at large, is outside the scope of the Center's stated purpose of "operat[ing] and maintain[ing] a chronic and convalescent care nursing home (i.e., skilled nursing facility) . . . ." As we noted in part I of this opinion, the provision of long-term health care and spiritual support to the elderly in a nonprofit, non-

discriminatory manner and without regard to individual financial circumstances is a charitable purpose. This is an apt summary of the purposes found in the Center's charter, bylaws and mission statement. Providing short-term rehabilitative care to the general public, although a necessary service and surely helpful to the Center's bottom line, simply cannot be characterized as falling within the Center's charitable purpose.[49] If the Center limited its provision of rehabilitative care to its existing population of elderly, long-term residents, we would be inclined to conclude that such services are within the scope of its charitable purpose as expressed in its corporate charter. Alternatively, the Center could amend its charter to broaden the availability of rehabilitative services for those elderly persons who are not part of its long-term patient population but who are drawn from the community at large. In such a case, the use of the Center's facility in furtherance of that charitable purpose would not defeat a claim for property tax exemption under the exclusive use requirement of § 12-81 (7).[50] The record, however, does not support such a characterization of the Center's operation with respect to the rehabilitative services that it advertises and promotes. These services are neither indispensable nor incidental to the Center's stated charitable purpose. We conclude, therefore, that the trial court properly determined that the Center's property is not used exclusively for its charitable purpose.

Moreover, the record is devoid of any evidence to indicate that the Center has satisfied the requirements

[49] By way of example, we note that the Center would presumably provide rehabilitative services to a sports superstar, such as Tiger Woods, working to overcome an injury or to recover from surgery. Such services simply cannot be considered charitable in any sense of the word.

[50] Justice Schaller labels this portion of our decision as "nothing less than an advisory opinion." Footnote 10 of the concurring and dissenting opinion. We disagree with this characterization. Although the explanatory examples we provide may be considered dicta, it is not improper for such dicta to be used to explain the scope or aid in the understanding of an opinion.

of § 12-88 so as to allow this court to conclude that a *portion* of the Center's property is used exclusively for its charitable purpose. The Center has not claimed, and the record does not indicate, that the facility is divided so that a part of the building is physically segregated and entirely devoted to the charitable, long-term care aspects of its business. Section 12-81 (7) is "[s]ubject to" the provisions of § 12-88. General Statutes (Rev. to 2003) § 12-81 (7). The last sentence of § 12-88 provides a mechanism for apportioning taxes between the part of the property used for charitable purposes and the part used for other, noncharitable purposes. Specifically, "[i]f a portion only of any lot or building belonging to, or held in trust for, any such organization is used exclusively for carrying out one or more of such purposes, such lot or building shall be so exempt only to the extent of the portion so used and the remaining portion shall be subject to taxation." General Statutes § 12-88. This language is unhelpful to the Center. We interpret this portion of § 12-88 to allow property taxes to be apportioned based on the physical use of the subject property and conclude that the Center's use does not qualify for such apportionment.

Our interpretation of this part of § 12-88 is bolstered by the approach that we have taken in the only case that we could find applying a statutory provision analogous to § 12-88 in a similar factual context. In *St. Bridget Convent Corp.* v. *Milford,* 87 Conn. 474, 475, 88 A. 881 (1913), we considered a claim brought by the plaintiff, a religious organization operating a boarding and day school, that its property was exempt from taxation. The school consisted of several buildings and a large tract of land, some of which was used as a campus and playground and a portion of which was operated as a vegetable garden. Id., 482. There also were two cottages on the plaintiff's property used as faculty housing. Id. The relevant statutory exemption provided in relevant

part: "The following property shall be exempt from taxation: . . . buildings or portions of buildings exclusively occupied as colleges, academies, churches, public schoolhouses, or infirmaries with the land appurtenant to such infirmaries . . . [and] buildings belonging to and used exclusively for scientific, literary, benevolent, or ecclesiastical societies . . . not including any real estate of any educational, benevolent, or ecclesiastical corporation or association . . . which is leased or used for other purposes than the specific purposes of such corporation or association . . . ." Public Acts 1911, c. 184. Pursuant to this public act, which is conceptually very similar to §§ 12-81 (7) and 12-88, we concluded that the campus, playground and school buildings themselves were entitled to an exemption, whereas that portion of the land used as a garden, together with the faculty cottages, was properly taxable. *St. Bridget Convent Corp.* v. *Milford,* supra, 482. We reasoned that, despite the beneficial use to which the school put this land, it was "not used for the specific purposes of the plaintiff," namely, as a school. Id. Because we could discern that an identifiable portion of the plaintiff's property was used exclusively by the school for educational purposes and another portion was used for other purposes, the tax burden on the property was apportioned accordingly.[51]

We conclude that the approach taken in *St. Bridget Convent Corp.* is a sound one, and is the approach dictated by § 12-88. Applying this approach in the pres-

[51] We find this case to be distinguishable from, and consistent with, our approach in *Hartford Hospital* v. *Hartford,* supra, 160 Conn. 370. In *Hartford Hospital,* the parties stipulated that the hospital's provision of housing to members of its staff in close proximity to its medical facilities was "necessary . . . in order properly to perform its services as a hospital." Id., 377. There was no claim in *St. Bridget Convent Corp.* that the cottages or garden were "necessary" for the accomplishment of the school's educational purpose. Likewise, in the present case, there is no claim that the Center's rehabilitative services are necessary for the fulfillment of its charitable purpose.

ent case, we note that the record indicates that the charitable and noncharitable aspects of the Center's operations are fully integrated and intertwined.[52] In the absence of proof that the Center's long-term chronic care services are offered in a portion of the facility that is physically separate from, and exclusively dedicated to, its short-term rehabilitative care operation, we are unable to apply § 12-88 to direct the apportionment of property tax between charitable and noncharitable uses of the subject property. Therefore, the Center cannot avail itself of § 12-88 to achieve a tax exemption for its otherwise charitable activities.

## III

## EXEMPTION OF THE CENTER'S CHAPEL

The Center's final claim is that the trial court improperly determined that the Center's chapel was not entitled to a tax exemption pursuant to §§ 12-81 (13) and 12-88. We agree.[53] General Statutes (Rev. to 2003) § 12-81 provides in relevant part: "The following-described property shall be exempt from taxation:

---

[52] The facility administrator testified:

"Q. . . . Are there any—at [the] Center—are the beds designated for particular uses?

"A. No."

[53] Justice Schaller declares that the trial court did not make specific "factual findings as to whether the chapel [is] a house of worship or whether the Center [is] a religious organization" and concludes, therefore, that the record is inadequate for us to review this claim. We disagree. The trial court stated that, "[a]lthough the nursing home has a large chapel on the premises, the . . . Center is not a religion or church, and the use of the chapel is merely an adjunct to the main use of the subject property as a skilled nursing home facility." Furthermore, the trial court implies that the chapel is a house of religious worship when it declares: "No evidence supports the [Center's] claim that *the use of the chapel for religious purposes* exempts the chapel itself from taxation pursuant to § 12-81 (13). . . . [N]o claim has been made that the chapel has a separate physical existence from the rest of the real estate, including the land." (Emphasis added.) Although the trial court's analysis with respect to the chapel ignores the import and operation of § 12-88, we conclude that the record is adequate for review on the basis of the trial court's specific factual findings with respect to the chapel.

* * *

"(13) Houses of religious worship. Subject to the provisions of section 12-88, houses of religious worship, the land on which they stand, their pews, furniture and equipment owned by, or held in trust for the use of, any religious organization . . . ." As we noted in part II of this opinion, the final sentence of § 12-88 allows for apportioned taxation "[i]f a portion only of any lot or building belonging to, or held in trust for, any . . . organization [set forth in § 12-81 (13), among other subdivisions] is used exclusively for carrying out one or more of such purposes, such lot or building shall be so exempt only to the extent of the portion so used and the remaining portion shall be subject to taxation." General Statutes § 12-88. Therefore, if the Center's chapel is a "[house] of religious worship . . . owned by, or held in trust for the use of, any religious organization"; General Statutes (Rev. to 2003) § 12-81 (13); the Center's property should be tax exempt to the extent that it is used as a chapel.

We have not had recent occasion to comment on the meaning of § 12-81 (13), or what is required for a building or portion of a building to be considered a house of religious worship. Our most recent detailed treatment of this issue occurred in *Masonic Building Assn. of Stamford, Connecticut, Inc.* v. *Stamford*, 119 Conn. 53, 174 A. 301 (1934). In that case, we considered a claim brought by the Masonic fraternity that its building, designated as a Masonic Temple, was exempt from property taxation, in whole or in part, as a house of religious worship. See id., 59. Discussing the history of the statutory predecessor to § 12-81 (13), we noted that the original language exempting "churches" had been broadened in a 1929 amendment to its current form, namely, "houses of religious worship . . . ." (Internal quotation marks omitted.) Id., 61. We found that the change was "intended to avoid the suggestion that only

those buildings exclusively used for churches, with the significance which that word undoubtedly had in the original provision for tax exemption and with the meaning which historically might be associated with it, should be exempt . . . ." Id. We did not believe that this change in language altered the essential meaning of the statute, however, in that qualified buildings must still maintain the "essential characteristics of churches . . . ." Id. We defined these "essential characteristics" to be "devot[ion] to the practice of religious worship as it is customarily carried on in or in connection with the forms of such worship traditional in this [s]tate . . . conduct[ing] services of worship open to all that care to attend . . . [with] purposes [that] are exclusively to further the worship of God and to carry out such activities as are the natural outgrowth of the teachings of religion." Id., 60; accord *Woodstock* v. *Retreat, Inc.,* 125 Conn. 52, 56, 3 A.2d 232 (1938); cf. *Connecticut Spiritualist Camp-Meeting Assn.* v. *East Lyme,* 54 Conn. 152, 155, 5 A. 849 (1886) (pavilion used partly for religious services and partly for "public amusement and for pecuniary profit" not entitled to exemption). But see *First Unitarian Society* v. *Hartford,* 66 Conn. 368, 375, 34 A. 89 (1895) (church building used for religious services and other nonreligious activities exempt when such activities were "not inappropriate to be had in a church" and revenue of which was used to "defray the expenses" of religious services). We think this approach, although ancient, is still valid today, and we proceed to apply it to the Center's chapel.

The Center's chapel clearly embodies the characteristics of a house of worship set forth in *Masonic Building Assn. of Stamford, Connecticut, Inc.*[54] The evidence

---

[54] Justice Schaller insists that we must remand this case to the trial court for a determination of whether the Center's chapel is, in fact, a house of worship within the meaning of § 12-81 (13). No one denies that a portion of the facility is used as a chapel. In fact, both parties and the trial court consistently refer to that portion of the facility as a chapel. A "chapel" is defined as "a subordinate or private place of worship" and "*a place of*

regarding the role that the chapel plays in the Center's mission and in the spiritual life of St. Joseph's Parish in general is undisputed. Monsignor West testified that "everything [at the Center] is centered around the chapel." More importantly for our present analysis, Monsignor West testified that daily mass is held in the chapel, as is the daily "Adoration of the Blessed Sacrament . . . ." There also was testimony indicating that the chapel is open to the public and that its services are available to members of all faiths.[55] The chapel has a full-time religious staff including a priest and five nuns, and is fully furnished with religious accoutrements provided by the diocese.[56] There is no evidence that the chapel is used for any purposes other than "the worship of God and to carry out such activities as are the natural outgrowth of the teachings of religion." *Masonic Building Assn. of Stamford, Connecticut, Inc. v. Stamford*, supra, 119 Conn. 60. In light of this evidence regarding the use of the chapel exclusively as a place of prayer and worship, and its central role in the spiritual aspects of the Center's mission, we have no trouble characterizing the chapel as a house of religious worship.[57]

*worship serving a residence or institution* . . . ." (Emphasis added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 207. The use of the Center's chapel as a house of religious worship is not disputed, and we do not see how its characterization as such can be.

[55] Monsignor West testified that "[n]o one is excluded" from the spiritual life at the Center and that religious personnel of other faiths are invited into the facility to minister residents of other faiths. He further testified that people from outside the Center are welcome to participate in the religious services offered in the chapel.

[56] The priest and nuns also minister to the residents outside the auspices of the chapel, particularly to those not physically well enough to be transported to the chapel for services.

[57] We note that the trial court found it significant that the Center did not claim a special exemption for the chapel from its inception in 1987. The question, however, is whether the chapel qualifies for tax-exempt status under § 12-81 (13) for the tax years in question, and nothing in the statute indicates that a failure to claim a tax exemption immediately for a particular use constitutes a waiver of the right to do so at a later date. The trial court

The statute also contains a requirement that the chapel be "owned by, or held in trust for the use of, any religious organization . . . ."[58] General Statutes (Rev. to 2003) § 12-81 (13). Although we could not find any decisions elaborating on this requirement, we think that the meaning of the language is plain, and we conclude that the Center's chapel is "owned by" a "religious organization" within the meaning of § 12-81 (13). Our conclusion rests principally on the Center's organizational structure and purpose as revealed in its corporate charter, bylaws and mission statement. The Center's charter provides that "[n]o act or proceeding of the [m]embers of the Corporation shall be valid without the approval of the [b]ishop," and the powers of the board of directors are specifically limited by "[c]hurch law . . . ." Furthermore, the Center's bylaws reveal a decidedly religious bent to the Center's purpose, namely, "to fulfill the goals and aspirations of the Roman Catholic Church in its ministry and service to the elderly and to those who are ill located in the [d]iocese" and "[t]o comply with the [e]thical and [r]eligious [d]irections for Catholic Health Care Services, as

also characterized the use of the chapel as "merely an adjunct to the main use of the subject property," and noted that "no claim has been made that the chapel has a separate physical existence from the rest of the real estate, including the land." Apart from our confusion as to how the chapel could have a separate physical existence from the land on which it was built, there is no requirement in § 12-81 (13) or § 12-88 that the "[house] of religious worship" have a separate physical existence in order to qualify for a tax exemption. In fact, § 12-88 specifically provides for a tax exemption for a "portion" of "any lot or *building* [used as a place of religious worship] . . . ." (Emphasis added.) General Statutes § 12-88. We can take judicial notice of the fact that numerous small churches maintain their "houses of worship" in otherwise commercial buildings, and we do not read the statutes as denying them an exemption under § 12-81 (13) merely because they do not have a "separate physical existence" from an otherwise taxable structure. As we previously noted, it is sufficient that the chapel exclusively occupies a distinct portion of the facility.

[58] Merriam-Webster's Collegiate Dictionary defines the word "own" as "to have or hold as property" and "to have power . . . over . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 887.

approved by the National Conference of Catholic Bishops . . . ." Its mission statement is even more explicit: "The mission of [the Center] is to provide quality health care to our residents in a spirit of compassion, love and service, consistent with the Gospel of Jesus Christ." We conclude that the Center is most accurately described as a religious organization organized for the charitable purpose of providing long-term health care to the elderly.

Our conclusion that the Center qualifies as a religious organization for purposes of § 12-81 (13) is bolstered by the relationship between the Center and St. Joseph's Parish and the diocese. The record indicates that the Center is closely associated with and actually controlled by the diocese. The town itself elicited testimony from Monsignor West that the Center is "related by a common membership with the Roman Catholic Diocesan Corporation." Monsignor West also testified that, as part of his duties as the pastor of St. Joseph's Parish, he serves on the board of directors and is vice president of the Center. The Center is listed in the Official Catholic Directory as an affiliated institution under the diocese, and the bishop serves as the president of the Center, as he does for every other Catholic corporation in the diocese. We conclude that the Center's religious character is sufficient to satisfy the statutory requirement that the house of worship, i.e., the chapel, be owned by "any religious organization . . . ." General Statutes (Rev. to 2003) § 12-81 (13).

In sum, we conclude that the trial court improperly determined that the Center's chapel was not entitled to a tax exemption pursuant to §§ 12-81 (13) and 12-88. The remainder of the Center's property, however, is not tax exempt because it is not exclusively dedicated to the Center's charitable mission of providing long-term, skilled nursing care to the elderly. The provision of short-term rehabilitative care to any member of the

public simply is not charitable or in keeping with the Center's charitable purpose, as set forth in its charter, in accordance with § 12-81 (7). Moreover, there is no evidence in the record that the short-term rehabilitative aspects of the Center are segregated and operated distinctly from its charitable work such that the tax can be apportioned under § 12-88 only with respect to the Center's noncharitable use of the property. We must conclude, therefore, that, apart from the portion of the property devoted to use as a chapel, the Center is not entitled to a tax exemption under § 12-81.

The judgment is reversed in part and the case is remanded with direction to render judgment sustaining the Center's appeal with respect to that portion of the Center's property devoted to use as a chapel.

In this opinion NORCOTT, KATZ and VERTE-FEUILLE, Js., concurred.

SCHALLER, J., concurring in part and dissenting in part. I agree with the majority's conclusion that the plaintiff, St. Joseph's Living Center, Inc. (Center), is not entitled to a tax exemption by the defendant, the town of Windham, pursuant to General Statutes (Rev. to 2003) § 12-81 (7).[1] I write separately because I respectfully disagree with the majority's analysis in several respects. Although the majority ultimately affirms the judgment of the trial court on the ground that the Center is not "*used* exclusively" for charitable purposes, it nonetheless takes issue with the trial court's answer to the question of whether the Center was "*organized* exclusively" for a charitable purpose. (Emphasis added.) General Statutes (Rev. to 2003) § 12-81 (7) (providing tax exemption to corporations organized exclusively for charitable purposes for real property used exclusively for charitable purposes). First, in light of the

[1] See footnote 1 of the majority opinion.

majority's agreement that the Center is not used exclusively for charitable purposes, it is unnecessary to reach the question of whether the Center has been organized exclusively for a charitable purpose. Second, since it did reach that question, I must take issue with the majority's application of the clearly erroneous standard and the manner in which it treats the factual record in this case. Finally, with respect to the majority's conclusion that the chapel qualifies for a tax exemption under § 12-81 (13),[2] I disagree and accordingly dissent from part III of the majority opinion. Upon review of the trial court's decision and the factual record, it is clear that the center failed to establish its case. The record presented on appeal provides no basis for the majority to characterize the chapel as a house of worship or to find that it is owned by a religious organization.

Although it may be useful to clarify the law with respect to these types of tax appeals, I believe this goal should be accomplished in this case without deciding whether the Center was organized exclusively for a charitable purpose. As the majority recognizes, in *Isaiah 61:1, Inc.* v. *Bridgeport,* 270 Conn. 69, 76–77, 851 A.2d 277 (2004), we set forth a five part test to determine whether a subject real property qualifies for a tax exemption under § 12-81 (7) and General Statutes § 12-88. I agree with the majority that the present case raises only the first two prongs of this test. Because the test is conjunctive,[3] however, it is not necessary to

---

[2] See footnote 5 of the majority opinion.

[3] The first two prongs of the test set forth in *Isaiah 61:1, Inc.* v. *Bridgeport,* supra, 270 Conn. 76–77, provide that "in order for real property used for charitable purposes to qualify for tax exemption under §§ 12-81 (7) and 12-88, the property must: (1) belong to or be held in trust for a corporation organized exclusively for charitable purposes; (2) be used exclusively for carrying out such charitable purposes . . . ." As the majority recognizes, the first two prongs track the language of § 12-81 (7). The statute also connects those two requirements conjunctively with the word "and," which we routinely interpret to require that both conditions must be fulfilled.

reverse the trial court's decision with respect to the first prong when the majority has affirmed the trial court's judgment on the basis of the second prong. See *Briggs* v. *McWeeny*, 260 Conn. 296, 316–17 n.14, 796 A.2d 516 (2002) (court need not reach issue unnecessary to resolution of case). The majority principally asserts that it is necessary to decide the threshold question of whether the Center is organized for a charitable purpose before it can proceed to the used exclusively prong. I note, however, that the majority's ultimate determination that the provision of short-term rehabilitative care to the general public is not a charitable use is not contingent on determining whether the Center is organized exclusively for some other charitable purpose.[4] Accordingly, I would not reach the issue of whether the Center was organized exclusively for charitable purposes.

In reaching the question of whether the Center was organized exclusively for a charitable purpose, the majority determines, contrary to the trial court, that it was so organized.[5] I disagree with the majority's conclu-

---

[4] The majority offers additional reasons why it is necessary to reach the first prong. See footnote 26 of the majority opinion. First, judicial economy is a worthy goal, but only when the resolution of an issue can be accomplished within the standard of review. More importantly, because each tax appeal is based on the purpose in effect for the tax years in question, any future tax appeals by the Center necessarily must be based on the corporate documents in effect for that particular year, which may or may not be the same as the documents in effect for this appeal. Second, the majority opinion does not clarify the law with respect to the first prong of *Isaiah 61:1, Inc.*, inasmuch as it remains unclear whether a failure to establish one of its three factors, in this case, the self-supporting factor, is fatal to a party's claim.

[5] The majority's discussion, in footnote 27, regarding the "organized exclusively for a charitable purpose" prong, calls into question the statutory analysis. The majority states that part I A of the majority opinion, which looks to a corporation's charter and bylaws to determine whether the entity is organized exclusively for a charitable purpose, is the *sine qua non* with respect to this first statutory prong. The opinion then states that the other factors, discussed in parts I B, I C and I D of the majority opinion, "should be considered under the totality of the circumstances to determine whether the organization is, in fact, fulfilling its charitable purpose." It is unclear, however, whether an entity that satisfies part I A, but fails any or all of parts I B, I C and/or I D, passes the "organized exclusively" prong. If part

sion that various findings of fact by the trial court were clearly erroneous, and, in particular, with the majority's determination that the factual record supports the *opposite* conclusion. I believe that the majority, in determining that the record supports the opposite conclusion, misapplies the highly deferential clearly erroneous standard of review. That standard of review prohibits the reviewing court from "examin[ing] the record to determine whether the trier of fact *could have reached a conclusion other than the one reached.* Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Emphasis added; internal quotation marks omitted.) *Fanny J. Crosby Memorial, Inc.* v. *Bridgeport,* 262 Conn. 213, 220, 811 A.2d 1277 (2002). "A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the reviewing court on the

---

I A truly is the *sine qua non,* failure to fulfill parts I B, I C or I D should not matter. If that is the case, what is the point of analyzing parts I B, I C or I D? On the other hand, if failure to satisfy parts I B, I C, and/or I D does matter, part I A would not be the *sine qua non.* Moreover, the practical—or conceptual—difference between fulfilling a charitable purpose and being in furtherance of a charitable purpose is unclear, because the former will now be part of the organized exclusively prong and the latter will be part of the used exclusively prong. Despite the majority's admonition that these analyses should not be confused, confusion seems very likely to occur. The result concerning the organized exclusively prong that the majority goes to such lengths to achieve comes at the cost of sacrificing consistency in the statutory analysis that it strives to clarify in the body of the opinion.

I suggest that it would be more appropriate to analyze the factors discussed in parts I B and I D of the majority opinion, namely, whether the entity is self-supporting and accepts private paying patients, under the "used exclusively" prong rather than the "organized exclusively" prong, whereas the discussion in part I C of the majority opinion, as to whether the entity relieves the state of a burden, should be subsumed within the analysis concerning charitable purpose in part I A of the majority opinion. The majority opinion appears to concede this point, in part, when its asserts that "the notion of 'self-supporting' could just as appropriately be discussed in the exclusive use analysis . . . ."

entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Isaiah 61:1, Inc.* v. *Bridgeport*, supra, 270 Conn. 73.

Furthermore, "[t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . *We cannot retry the facts or pass on the credibility of the witnesses.*" (Emphasis added; internal quotation marks omitted.) *Tyler's Cove Assn., Inc.* v. *Middlebury*, 44 Conn. App. 517, 527–28, 690 A.2d 412 (1997). In short, "[t]he conclusions of the trial court are to be tested by [its] finding[s]. *State* v. *Perkins*, 146 Conn. 518, 522, 152 A.2d 627 (1959); *Gorman* v. *American Sumatra Tobacco Corp.*, 146 Conn. 383, 386, 151 A.2d 341 (1959)." *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan*, 147 Conn. 510, 513, 162 A.2d 700 (1960).

Throughout the majority's analysis of whether the Center has been organized exclusively for charitable purposes, however, it disregards the findings of the trial court and essentially assumes the function of the finder of fact. In doing so, the majority ultimately decides that the trial court *could* have, and therefore *should* have, reached another conclusion. The majority's review is more akin to de novo review than to the deferential review required by the clearly erroneous standard. In making its alternate findings and conclusions, the majority relies heavily on "undisputed" testimony, which it credits, despite the fact that the trial court neither made such findings nor passed on the credibility of the witnesses on whose testimony the majority relies. "Undisputed" facts are not the equivalent of "found" facts. Our law does not require the finder of fact to accept the testimony of a witness *even if that testimony is undisputed. Barrila* v. *Blake*, 190 Conn. 631, 639, 461 A.2d 1375 (1983) ("[a] trier of fact is free to reject

testimony even if it is uncontradicted"). Moreover, a fact finder "is equally free to reject part of the testimony of a witness even if other parts have been found credible." Id. Although I will not identify each instance in which I believe the majority has misapplied the clearly erroneous standard of review, I focus my analysis on part I B of the majority opinion, which addresses the question of whether the Center is self-supporting.[6]

With respect to its analysis as to whether the Center is self-supporting, the majority concludes that the trial court's finding that the "Center does not receive, nor is it in need of, outside financial support in the operation of the skilled nursing home facility" was clearly erroneous. The majority's conclusion is based, in part, on its own "findings of fact," which include findings that: (1) the Roman Catholic Diocese of Norwich (diocese) saved the Center up to $120,000 per year in health care costs; and (2) the Center received valuable volunteer contributions, presumably without which the Center could not operate. The trial court neither made such findings nor indicated whether it believed or disbelieved such testimony.

The majority's "finding" with respect to health care cost savings was based on the testimony of Maureen Kolaczenko, the Center's administrator, whose testimony the trial court may or may not have credited. More importantly, this testimony was largely irrelevant to the question before the trial court. The Center appealed the denial of a tax exemption for the tax years

---

[6] As the majority observes, we have often held that if an entity is self-supporting it does not serve a charitable purpose. See *Common Fund* v. *Fairfield*, 228 Conn. 375, 383, 636 A.2d 795 (1994); *United Church of Christ* v. *West Hartford*, 206 Conn. 711, 719–22, 539 A.2d 573 (1988); *Waterbury First Church Housing, Inc.* v. *Brown*, 170 Conn. 556, 562–65, 367 A.2d 1386 (1976). It is unclear to me, therefore, even if we assume that the corporate documents establish a charitable purpose, see part I A of the majority opinion, why the trial court's finding that the Center was not in need of outside financial support does not defeat the Center's claim.

of 2003, 2004 and 2005. The diocese's purported savings of up to $120,000 occurred, however, after July, 2006. Our law clearly prohibits reliance on future actions in determining whether an entity is entitled to a tax exemption for the years challenged. See *United Church of Christ* v. *West Hartford*, 206 Conn. 711, 720, 539 A.2d 573 (1988) ("main flaw in the plaintiff's argument is that it is trying to establish a present tax exemption based on future intentions"; activities on tax day are determinative). Even if the trial court had credited this documentary and testimonial evidence, at most it could support only a finding that the diocese saved the Center $30,000 in health care costs in 2005.[7] There was *no evidence* of any kind regarding the diocese providing health care cost savings for the tax years of 2003 or 2004. It is unclear why the majority indicates that it must limit its analysis of an entity's corporate purpose to the purpose in effect during the tax years challenged, which I agree is proper, but, at the same time, freely relies on financial activity that occurs outside of the relevant tax years. Moreover, Kolaczenko also testified that the Center *is* financially self-supporting, testimony the majority dismisses out of hand. It is unclear how Kolaczenko, who has an undergraduate degree in accounting and an advanced degree in business, can be deemed *qualified* to testify about the Center's health care costs, but, according to the majority, is *not qualified* to testify that the Center is financially self-supporting. See footnote 34 of the majority opinion.[8]

The majority's "finding" with respect to the value of the volunteer contributions is similarly flawed. First,

[7] The plaintiff's exhibit fifty-three, which purportedly proves that the diocese renders the Center health care costs savings, only lists six monthly credits in the amount of $5000 each for the year 2005.

[8] Surprisingly, in dismissing Kolaczenko's testimony that the Center is financially self-supporting, the majority asserts that "there is no indication that the trial court relied on this testimony in making its finding"—an assertion that applies with equal force to the majority's two "findings."

even if we assume that this evidence is accurate, the exhibit on which the majority relies is dated June, 2006. It is unclear from the record, however, whether the Center had a volunteer program in the relevant years of 2003, 2004 and 2005, and, if it did, whether that program existed on a similar scale. Second, no evidence was presented regarding the value of these volunteer contributions, nor is it clear whether those contributions resulted in material cost savings. That is to say, the record does not indicate whether the costs associated with training, organizing and supervising the volunteers outweighed the benefit received. Despite these infirmities, the majority asserts that the Center "does indeed receive valuable in-kind volunteer contributions . . . ."

Finally, the majority's principal reliance on the Center's receipt of outside financial donations to conclude that it is not self-supporting does not warrant a conclusion that the trial court's factual findings were clearly erroneous, if that standard is to have any meaning. At the outset, it is significant that the trial court made no findings with respect to these contributions. Even assuming, however, that the Center's financial statements are accurate in this respect, those statements would support only a finding that in the relevant tax years the Center received outside financial donations of $33,706 in 2003, $30,668 in 2004, and $51,755 in 2005. In applying the comprehensive approach advocated by the majority, with which I agree, these contributions, when viewed in light of the trial court's other findings, more than adequately support the trial court's conclusion. The trial court found that "[t]he . . . Center generates an excess of operating income over operating expenses and for several years made payments to the diocese . . . ." These "voluntary" payments totaled $84,000 in 2003, $84,000 in 2004 and $63,000 in 2005. The Center's voluntary payments, therefore, *exceeded*

its receipt of private donations by $50,294 in 2003, $53,332 in 2004, and $11,245 in 2005. Accordingly, the trial court's finding that the Center was not in need of outside financial support was supported by the record and is not clearly erroneous.[9]

In short, our law requires a reviewing court to evaluate the trial court's conclusions by *the trial court's* findings, and not by the reviewing court's "findings" made on the basis of its own evidentiary review, unfettered by the trial court's findings. See *Camp Isabella Freedman of Connecticut, Inc.* v. *Canaan,* supra, 147 Conn. 513. In reaching an issue that is unnecessary to the resolution of this case, the majority improperly tests the trial court's conclusions on the basis of its own findings. The majority's resolution of this issue, therefore, is based on an evidentiary review of the record that lacks the authenticity of a trial court's fact-finding review. In the process, the majority credits various pieces of undisputed evidence that have not been scrutinized by the trial court. The conclusion—the opposite of the trial court's conclusion—lacks the proper evidentiary foundation. Accordingly, I concur in the result and

---

[9] The majority asserts that whether an entity needs outside support is irrelevant so long as it is "structured in such a way that it is intended to function with the aid of at least some private charitable support." First, I fail to understand how an entity that makes voluntary payments in excess of its receipt of outside contributions is structured to function with the aid of charitable support. Second, by removing any concept of need, the majority enlarges the scope of potentially exempt entities so long as those entities seek out and receive a token amount of outside financial support, which in this case represented the following percentages of total revenue: 0.34 percent in 2003; 0.31 percent in 2004; and 0.53 percent in 2005. I do not contend that entities should be judged on a year-to-year basis. The majority looks only to the receipt of outside voluntary contributions and disregards the fact that the Center makes contributions, itself, in order to determine whether the entity is *structured* to function with the aid of outside support. I contend that an entity that receives a de minimis amount of outside aid is not necessarily *structured* to be nonself-supporting. Whether it is possible to imagine what institutions that would qualify is beside the point. My approach would produce appropriate, not unduly restrictive, results.

would affirm the trial court solely on the basis of the second prong pertaining to exclusive use.[10]

With respect to the majority's conclusion that the chapel qualifies for a tax exemption under § 12-81 (13), I respectfully dissent. In denying the plaintiff's claim, the trial court issued a conclusory footnote that stated: "No evidence supports the plaintiff's claim that the use of the chapel for religious purposes exempts the chapel itself from taxation pursuant to § 12-81 (13)." The court further stated, however, that "[b]ecause this appeal contests the denial of a real estate property tax exemption, not an exemption for personal property . . . § 12-81 [13] is inapplicable to the issue in this case." It appears, therefore, that the trial court incorrectly concluded that § 12-81 (13) applies only to exemptions for personal property, despite that statute's explicit reference to an exemption for land.[11] Because the trial court applied an incorrect standard of law, the appropriate remedy is to remand the matter to the trial court for factual determinations on whether the chapel is a house of religious worship and whether the Center is a religious organization, as required for an exemption under § 12-81 (13).

Rather than order a remand, however, the majority engages in what amounts to de novo review of the

[10] Even though I generally agree with the majority's analysis with respect to the organized exclusively prong, I take issue with the majority's indication that, if the Center followed certain hypothetical guidelines, the majority would "be inclined to conclude that such services are within the scope of its charitable purpose as expressed in its corporate charter" and, therefore, presumably to rule in favor of the Center. This portion of the opinion amounts to nothing less than an advisory opinion. *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419, 880 A.2d 882 (2005) ("[w]e have consistently held that we do not render advisory opinions" [internal quotation marks omitted]).

[11] I believe this explains the trial court's statement that "no claim has been made that the chapel has a separate physical existence from the rest of the real estate, including the land." Essentially, the trial court appears to be asserting that no claim had been made that the chapel was personal property, as opposed to real property.

record to reach the conclusion that the Center qualifies for a tax exemption under § 12-81 (13).[12] Although the majority attempts to explain its actions by characterizing the chapel as a house of worship and by describing the Center as a religious organization, it is clear that the majority is engaging in appellate level fact-finding. First, the majority attempts to support its conclusion by asserting that the trial court's *paraphrasing* of the plaintiff's *claim* is evidence that the trial court implicitly found that the chapel was a house of religious worship.[13] I cannot agree with the proposition that we can construe a trial court's paraphrasing of a party's claim as the equivalent to a factual finding by the trial court. More importantly, the majority ignores the first part of the trial court's statement—that there is no evidence to support the plaintiff's claim. Second, the majority's fact-finding is based primarily on the self-serving statements by officials from the Center, whom, as I have stated previously, the trial court may or may not have credited. Moreover, to the extent that the majority's findings are based, in part, on the Center's corporate documents, in the absence of any findings by the trial court, we do not know whether the "religious bent" perceived by the majority in those documents was, in fact, put into practice during the tax years in question.

In short, the principal issues before the trial court in this case were whether the Center was organized

---

[12] In arguing from the proposition that "[n]o one denies that a portion of the facility is used as a chapel" that the Center is, therefore, entitled to a tax exemption, the majority unduly broadens the scope of entities that may be entitled to tax exemptions. The majority, of course, disregards for this purpose the Center's failure to establish at the trial court level that it is a "religious organization." That notwithstanding, surely not every physical space designated as a chapel entitles the owner to a tax exemption. The majority's result not only requires it to take on the fact-finding role of a trial court, but also may lead to unanticipated and undesirable consequences for municipalities similarly situated to the defendant in this case.

[13] To reiterate, the trial court stated "[n]o evidence supports the *plaintiff's claim* that the use of the chapel for religious purposes exempts the chapel itself from taxation." (Emphasis added.)

exclusively and used exclusively for a charitable purpose. Because the trial court misapplied § 12-81 (13), it did not make factual findings as to whether the chapel was a house of worship or whether the Center was a religious organization. Accordingly, the appropriate remedy is to remand the case to the trial court for further proceedings.

For the foregoing reasons, I respectfully concur in part and dissent in part.